[No. E046005. Fourth Dist., Div. Two. May 13, 2009.]

In re K.B. et al., Persons Coming Under the Juvenile Court Law.
RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,
Plaintiff and Respondent, v.
C.B. et al., Defendants and Appellants.

**COUNSEL**

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant C.B.

S. Lynne Klein, under appointment by the Court of Appeal, for Defendant and Appellant D.B.

Pamela J. Walls, Interim County Counsel, and Anna M. Deckert, Deputy County Counsel, for Plaintiff and Respondent.

Sharon S. Rollo, under appointment by the Court of Appeal, for Minors.

**OPINION** ·

**McKINSTER, J.**—The parents of Ka.B., Kr.B. and D.B. appeal from an order terminating their parental rights and placing the children for adoption. (Welf. & Inst. Code, § 366.26.)[1] They contend that, following our limited remand in their prior appeal from the termination order (*In re K.B.* (Dec. 7, 2006, E039777) [nonpub. opn.]) for compliance with the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.), the juvenile court erred by failing to vacate its disposition order and by finding, in compliance

---

[1] Further statutory citations refer to the Welfare and Institutions Code unless another code is specified.

with ICWA's requirements, that "active efforts" were made to prevent the breakup of the family. They also contend that there was insufficient evidence to support the finding that the children are likely to be adopted.[2] We reject these contentions, and we affirm the judgment of the juvenile court.

## FACTUAL AND PROCEDURAL HISTORY

Ka.B, Kr.B. and D.B. and their half sister, Ke.B. (hereafter Ka., Kr., D. and Ke.), were the subjects of a prior dependency proceeding which was initiated in August 2001 and terminated in December 2003 with the four children being returned to the mother's custody.[3] The petition, which was filed before D. was born, alleged that the mother's residence was filthy; that the mother left the children with an unrelated caretaker for an extended period without providing adequately for their care and support, thus placing the children at risk of serious physical harm; that the children were extremely dirty and that their health needs were not being provided for; that the mother and the father of Ka. and Kr. had a history of criminal behavior; and that the fathers were not providing support. The father of Ka. and Kr. (i.e., the appellant father in this appeal) was in prison on drug charges, and the whereabouts of Ke.'s father were unknown. When D. was born in February 2003, a petition was filed as to him, but he remained in the physical custody of the mother. The mother successfully reunited with the children, and the petition was dismissed in December 2003.

The father was released from prison on parole during the pendency of the prior proceeding, but because of a prior conviction for lewd and lascivious acts on a child under the age of 14 (Pen. Code, § 288, subd. (a)), his parole conditions forbade contact with minors under a specified age,[4] including his own children, and forbade him to live with any minor "18 years or younger."

The current petition was filed on March 9, 2004. It alleged that the father, who was living with the family in violation of the conditions of his parole,[5] had molested Ke., then 14 years old, and that the mother knew or reasonably should have known that the children were at risk of sexual abuse. The

---

[2] The parents raise similar arguments in their individual briefs, and they join in each other's briefs. Accordingly, we do not differentiate between their arguments.

[3] Ke. was adopted on May 18, 2007, by the same couple who are the prospective adoptive parents of the younger three children. She is not a party to this appeal. References to "the children" herein generally refer only to Ka., Kr. and D. Likewise, references to "the father" refer to appellant, the father of Ka., Kr. and D.

[4] The notice of the conditions of the father's parole appears to say that he is not to have contact with minors under the age of three. There is a flaw in the copy which appears in the record, however, and we assume that the notice actually prohibits contact with minors under the age of 18.

[5] The father's parole did not expire until August 29, 2004.

petition alleged that the children were filthy and infested with head lice, that the parents engaged in acts of domestic violence, and that the mother had previously been provided with reunification and family maintenance services but had failed to benefit from those services. The allegations of the petition were found true. The children were placed in foster care. Services were ordered for the mother, but not for the father. Ultimately, parental rights were terminated and the children were freed for adoption by their foster parents.[6]

During the prior dependency proceeding, the father informed the Riverside County Department of Public Social Services (DPSS) that he might have Indian ancestry. No action was taken to notify the appropriate tribal authorities pursuant to ICWA before that case was dismissed. When the current petition was filed, the father's information was ignored, and no inquiry was made of either parent as to possible Indian ancestry. The father also failed to inform the court that ICWA might apply. The father asserted for the first time in his appeal from the original termination order in the current proceeding that the court had failed to comply with the notice provisions of ICWA. (*In re K.B., supra,* E039777.) We affirmed the juvenile court's finding that the children are adoptable, but reversed the termination order and remanded the cause for the limited purpose of providing the mandatory notice to the appropriate tribal authorities. We ordered that "If, after proper notice, a tribe claims the minors . . . as Indian children, the juvenile court shall proceed in conformity with all provisions of ICWA." (*Ibid.*)

Following remand, notice was given, and on May 31, 2007, the Choctaw Nation of Oklahoma determined that the children had Choctaw heritage and that they were Indian children within the meaning of ICWA.[7] The father was recognized as a member of the tribe on June 30, 2007. On August 27, 2007, the juvenile court found that ICWA applied. The tribe intervened but did not assert jurisdiction. It chose instead to review all filings in the case, to work directly with the social worker and to make recommendations. Several months later, after having received the reports filed by DPSS, the tribe stated that it was in agreement with termination of parental rights and the plan for adoption. It originally asked that all family members be considered as

---

[6] During the pendency of these proceedings, another child, M., was born to the parents. A petition was filed and sustained as to that child as well. He is not a party to this appeal.

[7] The mother indicated that she has Cherokee ancestry. However, all of the Cherokee tribes which responded to the ICWA notice stated that the children were neither members nor eligible for membership. On August 27, 2007, the court found that the children are not Indian children with regard to the United Keetoowah Band of Cherokees and the Eastern Band of Cherokees. Neither parent makes any contention based on a claim that ICWA applies to the children because of the mother's alleged Indian heritage.

adoptive parents, but ultimately agreed to the plan for adoption by the children's current nontribal[8] caretakers.

On June 5, 2008, at the scheduled hearing on termination of parental rights, the parents asked the court to vacate all prior orders as having been rendered in violation of ICWA. The court conducted a hearing and determined that the substantive requirements of ICWA had been met and that the earlier failure to give notice as required by ICWA was not prejudicial. The court then conducted a hearing pursuant to section 366.26. It terminated parental rights and adopted a permanent plan of adoption by the children's current caretakers. The parents appealed.

## LEGAL ANALYSIS

### FAILURE TO COMPLY WITH ICWA DOES NOT DEPRIVE THE COURT OF JURISDICTION TO ENTER DISPOSITION ORDERS

Both ICWA and the Welfare and Institutions Code provide that any party seeking an involuntary foster care placement of an Indian child must satisfy the court that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (25 U.S.C. § 1912(d); Welf. & Inst. Code, § 361.7, subd. (a); see also Cal. Rules of Court, rule 5.484(c).) Both state and federal law provide that any parent from whose custody an Indian child was removed may petition the court to invalidate an order for foster care or termination of parental rights if the order violated any provision of specified sections of ICWA, including title 25 United States Code section 1912. (25 U.S.C. § 1914; Welf. & Inst. Code, § 224, subd. (e).)

At the scheduled section 366.26 hearing on June 5, 2008, the parents asked the court to vacate all of its prior orders pursuant to title 25 United States Code section 1914 for lack of compliance with ICWA. The parents contended that because the court had not previously found that "active efforts" had been made to prevent the breakup of the family before placing the children in foster care, as required by title 25 United States Code section 1912(d), the court lacked jurisdiction to proceed to a hearing on termination of parental rights. The parents also contended that the court lacked jurisdiction to place the children in foster care because the disposition order was not supported by testimony by an expert on Indian tribal matters.

After hearing argument and reviewing the file and this court's opinion in *In re S.B.* (2005) 130 Cal.App.4th 1148 [30 Cal.Rptr.3d 726], the court

---

[8] The prospective adoptive parents are not members of the Choctaw Nation. However, the prospective adoptive father is a registered member of the Cherokee tribe.

concluded that there was no reasonable probability that if the substantive provisions of ICWA had been applied, either parent would have received more favorable results. For that reason, the court declined to vacate the past orders and proceeded to hold the section 366.26 hearing.

The parents now contend, as they did below, that the juvenile court lacked jurisdiction to enter disposition orders placing the children in foster care because the court failed to comply with ICWA's notice provisions.

■ We agree with the line of cases which holds that failure to comply with ICWA's notice provisions does not divest courts of jurisdiction to remove an Indian child from the custody of the parents. (See, e.g., *In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1410–1411 [129 Cal.Rptr.2d 15]; *Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 785 [53 Cal.Rptr.3d 251]; but see *In re Desiree F.* (2000) 83 Cal.App.4th 460, 474–475 [99 Cal.Rptr.2d 688]; *In re Samuel P.* (2002) 99 Cal.App.4th 1259, 1267 [121 Cal.Rptr.2d 820].) Accordingly, we reject the parents' contention.

■ DPSS contends that the juvenile court lacked the authority to entertain the request to invalidate the disposition order in any event, because in the prior appeal, we reversed only the order terminating parental rights. When a judgment is reversed with directions, the trial court's jurisdiction is limited by those directions. (*In re N.M.* (2008) 161 Cal.App.4th 253, 264 [74 Cal.Rptr.3d 138].) DPSS is correct that our opinion reversed only the final order for purposes of compliance with ICWA's notice provisions. However, we also directed that if the children were found to be Indian children, the trial court must proceed "in conformity with all provisions of ICWA." (*In re K.B., supra,* E039777.) As noted above, ICWA permits the parents to petition the juvenile court to invalidate prior orders. (25 U.S.C. § 1914; Welf. & Inst. Code, § 224, subd. (e).) Consequently, despite the fact that we reversed only the termination order, the juvenile court was required to consider the parents' contention that the disposition order placing the children in foster care should be invalidated.

## "ACTIVE EFFORTS" TO PREVENT BREAKUP OF THE FAMILY WERE NOT REQUIRED BEFORE THE DISPOSITION HEARING

■ In a dependency proceeding which does not involve an Indian child, the court must "make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home or, if the minor is removed for one of the reasons stated in paragraph (5) of subdivision (c), whether it was reasonable under the circumstances not to make any of those efforts." (§ 361, subd. (d).) In a case involving an

Indian child, however, the court must determine "whether active efforts as required in Section 361.7 were made and that these efforts have proved unsuccessful." (*Ibid.*) Section 361.7, which in part adopts the provisions of title 25 United States Code section 1912(d) and (e), provides, in part, that "a party seeking an involuntary foster care placement of, or termination of parental rights over, an Indian child shall provide evidence to the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (§ 361.7, subd. (a).)

At the disposition hearing, which was held before the court was on notice that ICWA might apply, the court found that "reasonable efforts" had been made to prevent or to eliminate the need for removal of the children from their home. The parents contend that a finding of "reasonable efforts" is a lower standard than the finding of "active efforts" required by ICWA and by section 361.7, subdivision (a). Accordingly, they contend, even if the original failure to provide notice pursuant to ICWA was not jurisdictional, it was nevertheless prejudicial error because, if notice had been given in a timely manner, the children would have been found to be Indian children before the disposition hearing, and the court would have been required to provide remedial services before ordering the children placed in foster care. The parents assert, based on *In re S.B., supra*, 130 Cal.App.4th 1148, that we must find the notice error prejudicial unless we determine that there is no reason to suppose that if the juvenile court had been asked to find whether "active efforts" were made before it issued the disposition order placing the children in foster care, rather than "reasonable efforts," it would have made a different finding.

We disagree that the standard enunciated in *In re S.B., supra*, 130 Cal.App.4th 1148 is the correct standard of review in this case. Unlike the court in *In re S.B.*, the juvenile court in this case, in ruling on the motion to invalidate the prior orders, found that active efforts *were* made prior to the disposition hearing. Consequently, if we were to review this finding, we would do so by applying the substantial evidence rule. (See, e.g., *In re Michael G.* (1998) 63 Cal.App.4th 700, 715–716 [74 Cal.Rptr.2d 642].) We need not engage in a substantial evidence review, however. As we discuss below, we can determine, as a matter of law, that even if the court had been on notice that ICWA might apply, it was not required to find that active efforts were made before placing the children in foster care.

The parents also contend that because no services were offered to the father before the disposition hearing, the court could not find that active efforts within the meaning of ICWA had been made to prevent the breakup of the family. Services were denied to the father based on section 361.5,

subdivision (b)(12), which provides that a court may deny services to a parent who has been convicted of a violent felony, as set forth in Penal Code section 667.5, subdivision (c).[9] However, as the parents point out, section 361.7, subdivision (a) applies "notwithstanding" section 361.5. For that reason, they contend that in a case governed by ICWA, the court must under *all* circumstances make active efforts to provide remedial services and rehabilitative programs before issuing an order placing the child in foster care. We disagree.

■ In *Letitia V. v. Superior Court* (2000) 81 Cal.App.4th 1009 [97 Cal.Rptr.2d 303] (*Letitia V.*), the court held that ICWA does not require a juvenile court to offer reunification services to a parent who failed, in prior dependency proceedings, to reunify with her children, despite active efforts having been made to assist her in overcoming her drug dependency. The court held that offering services as to a later born child, after previous reunification efforts had failed, would be an idle act not required by ICWA. (*Letitia V.*, at pp. 1015–1018.) The court explained that the phrase "active efforts" means only that "timely and affirmative steps be taken to accomplish the goal which Congress has set: to avoid the breakup of Indian families *whenever possible* by providing services designed to remedy problems which might lead to severance of the parent-child relationship." (*Id.* at p. 1016, italics added.) Thus, the court reasoned, where the parent's history indicates the futility of offering services, no further services must be offered. (*Id.* at pp. 1016–1017.)

Here, in contrast to *Letitia V., supra*, 81 Cal.App.4th 1009, the father had not previously been offered services. Nevertheless, his history clearly demonstrates the futility of offering reunification services: He is a registered sex offender with a prior conviction for lewd and lascivious acts on a child under the age of 14. (Pen. Code, § 288, subd. (a).) In the current proceeding, the court sustained the allegations that he sexually molested Ke., the children's 14-year-old half sister. The parents do not suggest any services which might have been offered to the father under the circumstances and we cannot conceive of any services which could usefully be offered to a registered sex offender with a prior conviction for molesting a child and a current finding of molesting a different child. For these reasons, requiring the court to provide services to the father would be at best an idle act which would not further the legislative purposes of ICWA.[10] (See *Letitia V.*, at pp. 1015–1018.)

---

[9] A violation of Penal Code section 288, subdivision (a) is a violent felony. (Pen. Code, § 667.5, subd. (c)(6).)

[10] In his reply brief, the father contends that *Letitia V.*'s analysis does not apply to section 361.7, which was enacted after *Letitia V.* was decided. However, section 361.7 was enacted to bring California's dependency statutes into compliance with ICWA. (See Historical and Statutory Notes, 73A pt. 1 West's Ann. Welf. & Inst. Code (2008 ed.) foll. § 361.7, p. 119;

There was also no need to make active efforts to offer remedial services to the mother before placing the children in foster care. The mother knew that the father was a registered sex offender. During the prior dependency, she was told by the social workers, the court and her therapist that he should not be around the children. Nevertheless, as soon as that case was closed, she allowed him to reside with the family, thus facilitating the molestation of her oldest daughter. Despite her knowledge of the father's history, she denied that the abuse took place. She also counseled her daughter just to "forget about" the abuse or to "get over it and move on," thus demonstrating her unwillingness to protect her children from the father's abuse. The mother's unwillingness or inability to recognize the danger posed by the father to her children and her resulting inability to protect them are sufficient to justify the court's order. Placing the children in foster care at the disposition stage did not conflict with the objectives of ICWA. ICWA was intended " 'to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society.' [Citation.]" (*Mississippi Choctaw Indian Band v. Holyfield* (1989) 490 U.S. 30, 37 [104 L.Ed.2d 29, 109 S.Ct. 1597].) It was not intended as a shield to permit abusive treatment of Indian children by their parents. (*Matter of S.D.* (S.D. 1987) 402 N.W.2d 346, 351; see also *People in Interest of J.J.* (S.D. 1990) 454 N.W.2d 317, 325.) Under these circumstances, no reasonable court would have ordered the children placed with either parent, rather than in foster care, while the parents were given services which might prevent further sexual abuse. Indeed, we cannot imagine a more egregious abuse of discretion than leaving these children vulnerable to such abuse. The court's disposition order for further services to the mother amply furthered the goals of ICWA.[11]

---

Historical and Statutory Notes, 29C West's Ann. Fam. Code (2009 supp.) foll. § 170, p. 4.) Accordingly, *Letitia V.*'s analysis applies under section 361.7 as well.

[11] Neither party challenges the court's denial of their request to invalidate the disposition order on the ground that the disposition was not supported by the testimony "of a qualified expert witness, as defined in Section 224.6, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child," as required by section 361.7, subdivision (c). Consequently, we deem any such contention forfeited. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 & fn. 10 [57 Cal.Rptr.3d 363]; *Sunset Drive Corp. v. City of Redlands* (1999) 73 Cal.App.4th 215, 226 [86 Cal.Rptr.2d 209].)

In any event, the expert who testified at the section 366.26 hearing stated in his declaration that in his opinion, returning the children to the custody of either parent would cause danger of serious emotional and physical harm to the children. At the disposition hearing, the court found that there was a substantial risk to the children's physical or emotional well-being if they were returned to the custody of either parent. If the expert witness had testified at the disposition hearing, there is no reason to suppose that the court would have made a different finding. (*In re S.B., supra,* 130 Cal.App.4th at p. 1166.)

## THE COURT CORRECTLY FOUND THAT THE ACTIVE EFFORTS REQUIREMENT OF SECTION 366.26 WAS SATISFIED.

■ Section 361.7, subdivision (a) provides that the court must make "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." Section 366.26, subdivision (c)(2)(B) provides that parental rights to an Indian child shall not be terminated if the court finds that active efforts, as required by section 361.7, have not been made, or if the court does not make a determination, supported by evidence beyond a reasonable doubt, "including testimony of one or more 'qualified expert witnesses' as defined in Section 224.6, that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child." (§ 366.26, subd. (c)(2)(B)(i), (ii).) Section 361.7, subdivision (b) states: "What constitutes active efforts shall be assessed on a case-by-case basis. The active efforts shall be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe. Active efforts shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian care-giver service providers."

At the section 366.26 hearing, the court found that active efforts had been made. The court also found, based on the testimony of the expert witness, Philip Powers, that because the Choctaw Nation's protocol was to rely on the local jurisdiction to provide services, the services provided in this case would not have differed if the tribe had been involved at an earlier stage of the proceedings.

We first address the parents' contention that the court's active efforts finding cannot be upheld because the services provided to the mother before our reversal of the prior termination order did not amount to active efforts within the meaning of section 361.7.

Whether active efforts were made is a mixed question of law and fact. (*E.A. v. State Div. of Family and Youth Services* (Alaska 2002) 46 P.3d 986, 989.) We can determine what services were provided by reference to the record. Whether those services constituted "active efforts" within the meaning of section 361.7 is a question of law which we decide independently. (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].)

■ Neither ICWA nor its California counterpart defines active efforts. (25 U.S.C. § 1912(d); Welf. & Inst. Code, § 361.7.) Thus, while it is clear

that ICWA requires that "timely and affirmative steps be taken to accomplish the goal . . . [of avoiding] the breakup of Indian families whenever possible" (*Letitia V., supra*, 81 Cal.App.4th at p. 1016), " 'no pat formula' " exists for distinguishing between active and passive efforts (*A.A. v. State* (Alaska 1999) 982 P.2d 256, 261). However, the following is a useful guideline: "Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts . . . is where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child." (*Ibid.*, fn. omitted.)

■ Here, in the prior dependency, DPSS provided numerous services to the mother. She was referred to a 90-day inpatient substance abuse program and to counseling. She completed both. She was referred to a parenting class, which she completed. DPSS also provided her with homemaking assistance and assistance in finding housing, including providing her with resources to find shelter housing and to find available permanent housing and providing monetary assistance with rent. It provided her with bus passes to assist her in attending the programs and to facilitate visitation with her children. In the current dependency, DPSS also referred her to Parents United, a program designed to educate parents on issues of sexual abuse and to help them learn to protect their children from sexual abuse. The mother told DPSS that she had learned a great deal from that program. It is abundantly clear that DPSS did more than merely draw up a reunification plan and leave the mother to use her own resources to bring it to fruition. (See *A.M. v. State* (Alaska 1997) 945 P.2d 296, 306; *A.A. v. State, supra*, 982 P.2d at p. 261.) On the contrary, DPSS provided the mother with the resources necessary to achieve the goals of her case plan. This constitutes "active efforts" within the meaning of ICWA.[12]

As to the father, active efforts were not required for the same reason they were not required prior to the disposition order placing the children in foster

---

[12] The parents note that "Indian expert" Philip Powers's testimony does not support the court's conclusion that active efforts were made. ICWA does not require that the court's finding that active efforts were made be supported by expert testimony, however; rather, only the finding that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child must be supported by expert testimony. (§ 366.26, subd. (c)(2)(B)(i), (ii); 25 U.S.C. § 1912(f).) As we have discussed above, whether the services provided constituted "active efforts" within the meaning of the pertinent statutes is a question of law which this court decides independently. Consequently, Powers's opinion is irrelevant to our analysis.

care: There were no services which could be offered to him which would have prevented the breakup of the family, which was due to his sexual abuse of Ke., along with the mother's inability to protect the other children from similar abuse.

The parents also contend that the termination order cannot be sustained because no services were provided after the remand. Neither cites any authority which supports their contention. ICWA requires that an order terminating parental rights be supported by a finding that active efforts were made but were unsuccessful. (§§ 361.7, subd. (b), 366.26, subd. (c)(2)(B)(i), (ii); 25 U.S.C. § 1912(d).) Here, the court complied with that directive by finding that active efforts were made over a period of several years, both during the prior dependency and during the current dependency proceeding. There is no requirement that additional efforts be made after the children were belatedly determined to be Indian children.

The parents also argue that the termination order cannot be sustained because DPSS failed to comply with the requirement that the active efforts "be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe. Active efforts shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers." (§ 361.7, subd. (b).) Active efforts required by ICWA are "timely and affirmative steps . . . to remedy problems which might lead to severance of the parent-child relationship." (*Letitia V., supra,* 81 Cal.App.4th at p. 1016.) The parents do not suggest how any services related to the cultural values, etc., of the tribe would have been of any use in remedying the problem which ultimately led to the breakup of this family (see § 361.7, subd. (b)), i.e., the father's sexual abuse of the children's half sister and the mother's failure or refusal to accept that the abuse occurred, thus preventing her from protecting the children from similar abuse. In the absence of any showing that there were services or resources which might have been useful in remedying the problem underlying the dependency, the parents have failed to meet their burden on appeal of demonstrating prejudicial error. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610 [109 Cal.Rptr.2d 256].)

## ACTIVE EFFORTS WERE MADE TO FIND APPROPRIATE FAMILY MEMBERS WITH WHOM TO PLACE THE CHILDREN

ICWA provides that in an adoptive placement of an Indian child, in the absence of good cause to the contrary, preference shall be given to a

placement with a member of the child's extended family, other members of the child's tribe, or other Indian families. (25 U.S.C. 1915(a); Welf. & Inst. Code, § 361.31, subd. (c).)

 The parents contend that DPSS made insufficient efforts to place the children with extended family members. They couch their arguments in terms of the court's duty to find that "active efforts" were made to assess maternal relatives and contend that such efforts were not made. Sections 361.7 and 366.26 do not require a finding that active efforts were made to find an appropriate placement within the statutory framework, however. Rather, when a court has not ordered an Indian child placed in a preferred placement, the question is whether good cause existed to deviate from the statutory preferences. (*Fresno County Dept. of Children & Family Services v. Superior Court* (2004) 122 Cal.App.4th 626, 641–643 [19 Cal.Rptr.3d 155].) Because the parents have not challenged the current placement on that basis, we need not determine whether good cause did or did not exist. Rather, we will address the parents' arguments as made. We conclude that active efforts to assess extended family members were made.

The record shows that in 2005, the mother's two sisters and her mother were approached as possible placements. One maternal aunt in Ohio was interested in taking the children but the Interstate Compact on the Placement of Children (Fam. Code, § 7900 et seq.) request was denied by the State of Ohio "after interviewing and conducting a home evaluation of the aunt's home."

The other maternal aunt and the maternal grandmother live together. Their placement request was initially denied because the maternal aunt did not return the forms DPSS sent her. She later did so, and the placement request was submitted to the Relative Assessment Unit. The father contends that the record is silent as to the outcome of that assessment. However, the record shows that at the time maternal relatives were assessed at the beginning of the case, "the mother was living with [the maternal aunt and grandmother] and [their home] could not be approved." The record also shows that the aunt had convictions for felony burglary, receiving stolen goods, and forgery. In 2007, the maternal grandmother's home was again assessed, this time as a possible placement for the youngest child, M. One report states that this home was rejected in July 2007, because the mother was living there "off and on." It also states that DPSS was concerned that the grandmother would not be able to protect the child. The next report states that the mother was still living with the maternal grandmother and had not provided the information necessary to complete background checks for "the adults" living in the home. The record thus demonstrates that the maternal relatives were assessed not once but twice. As far as the record shows, the second assessment of the

maternal aunt and grandmother was not completed only because the mother or the grandmother and aunt failed to follow through with necessary documentation. Consequently, even if we assume that an "active efforts" assessment is appropriate, we conclude that DPSS made active efforts to assess the maternal relatives.

The parents do not mention the paternal relatives. Nevertheless, we note the following: The paternal grandfather was deceased, and although the paternal "grandparents"[13] were interested in adopting M., their two-bedroom apartment could not accommodate the other three children. The father did not suggest any other relatives for consideration. We are not aware of anything further DPSS could have done to assess paternal relatives.

As we have noted elsewhere, the prospective adoptive father is a registered Cherokee. Placement with an Indian family is the third level of preference, as stated in title 25 United States Code section 1915(a) and Welfare and Institutions Code section 361.31, subdivision (c). Since there is no evidence that there was any suitable member of the children's extended family available for placement or any evidence that any other member of the Choctaw Nation was available to take the children, the placement with the prospective adoptive parents satisfies the requirements of ICWA.

## SUBSTANTIAL EVIDENCE SUPPORTS THE FINDING THAT THE CHILDREN ARE ADOPTABLE

Before terminating parental rights, the court must find by clear and convincing evidence that it is likely that the child will be adopted within a reasonable amount of time. (§ 366.26, subd. (c)(1); *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1204 [101 Cal.Rptr.2d 449] (*Jerome D.*).) The finding of adoptability is reviewed under the substantial evidence test. (*In re Asia L.* (2003) 107 Cal.App.4th 498, 509–510 [132 Cal.Rptr.2d 733].)

The parents contest the court's finding that the children are adoptable. They argue that the record shows that the children are not generally adoptable because of their various special needs and because they are a sibling group. They contend that in the absence of evidence that children are generally adoptable, there must be clear and convincing evidence that there is an approved prospective adoptive family which is interested in adopting the children. Although a home study of the prospective adoptive parents has been completed, the prospective adoptive parents have not yet been approved. Therefore, the parents contend, the court's finding that these special-needs children are adoptable must be reversed.

---

[13] We assume this refers to the paternal grandmother and her current husband.

DPSS contends that we need not address this issue because we concluded in the prior appeal that substantial evidence supported the court's finding that the children are adoptable. (*In re K.B., supra,* E039777.) It notes that our remand was limited to issues pertaining to ICWA.

As we have discussed elsewhere, remand with directions limits the scope of the trial court's jurisdiction. (*In re N.M., supra,* 161 Cal.App.4th at p. 264.) In this case, we directed that the order terminating parental rights could be reinstated if the court found, after proper notice, that ICWA did not apply. (*In re K.B., supra,* E039777.) Accordingly, if ICWA had not applied, the juvenile court would not have needed to hold a new termination hearing. Because ICWA was found to apply, however, it was necessary to conduct a new termination hearing in order for the court to make the requisite ICWA findings discussed above. In order to enter a new order terminating parental rights, the court was also required to find, again, that the children are adoptable. (§ 366.26, subd. (c)(1).) Moreover, dependency cases by their nature are not static, and, because circumstances can change dramatically, the court must make its orders based on the circumstances existing at the time of the hearing. (See *In re Arturo A.* (1992) 8 Cal.App.4th 229, 243–244 [10 Cal.Rptr.2d 131].) As we discuss below, the parents' argument is based in part on the contention that changed circumstances have rendered the evidence insufficient to support the finding of adoptability. Although we disagree with the parents' arguments, we do agree that the issue may be reviewed in this appeal.

As the parents assert, the children are special-needs children as defined in Family Code section 8545: Kr. and D. are mildly mentally retarded, Ka. is developmentally delayed as a result of fetal alcohol syndrome, all three have speech difficulties which have required treatment, and they are part of a sibling group which should remain intact, and are over the age of three.[14]

The parents contend that there is no evidence that the children are generally adoptable, and that in the absence of evidence that they are generally adoptable, the finding of adoptability cannot be sustained in the absence of evidence that there is an "approved" prospective adoptive family which has expressed interest in adopting them. They contend that even though the prospective adoptive parents have stated that they are willing to adopt the children, the fact that they have not yet been "approved" to adopt them requires reversal of the finding of adoptability.

---

[14] " 'Special-needs child' means a child whose adoption without financial assistance would be unlikely because of adverse parental background, ethnic background, race, color, language, membership in a sibling group that should remain intact, mental, physical, medical, or emotional handicaps, or age of three years or more." (Fam. Code, § 8545.)

In the prior appeal, we concluded, contrary to the parents' assertion, that there was substantial evidence from which the court could conclude that the children were generally adoptable. (*In re K.B., supra,* E039777.) The parents point to changed circumstances which have developed over the two years that have elapsed since that opinion, including the facts that Kr. and D. have been diagnosed as mildly mentally retarded since that time, and that the prospective adoptive mother had reported that Ka. had reverted to earlier behaviors of stealing and acting out sexually and had requested a psychiatric evaluation for Ka. She believed that Ka. needed an IEP (individual educational plan), and the school had previously required a psychiatric evaluation before it would complete an IEP assessment. Even if we assume, however, that this new evidence moots the previous finding of adoptability and that the court could not, on the basis of that evidence, have reasonably found that the children are generally adoptable, the juvenile court's conclusion that the children are adoptable is supported by substantial evidence.

Although a finding of adoptability must be supported by clear and convincing evidence, it is nevertheless a low threshold: The court must merely determine that it is "likely" that the child will be adopted within a reasonable time. (§ 366.26, subd. (c)(1); *In re Jayson T.* (2002) 97 Cal.App.4th 75, 84–85 [118 Cal.Rptr.2d 228], disapproved on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 414 [2 Cal.Rptr.3d 683, 73 P.3d 541].) We review that finding only to determine whether there is evidence, contested or uncontested, from which a reasonable court could reach that conclusion. It is irrelevant that there may be evidence which would support a contrary conclusion. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 53 [82 Cal.Rptr.2d 426].)

■ It is well established that if a child has special needs which render the child not generally adoptable, a finding of adoptability can nevertheless be upheld if a prospective adoptive family has been identified as willing to adopt the child and the evidence supports the conclusion that it is reasonably likely that the child will in fact be adopted within a reasonable time. (See *In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1650 [28 Cal.Rptr.2d 82]; see also *In re Scott M.* (1993) 13 Cal.App.4th 839, 844 [16 Cal.Rptr.2d 766].) Here, the children had been residing with their prospective adoptive parents since October 2005. It had been reported since 2002 that Kr. and Ka. had developmental delays resulting from fetal alcohol syndrome, and all three children had speech and educational problems. Ka. had apparently at some earlier point exhibited the behaviors that motivated the prospective adoptive mother's request for a psychiatric evaluation. Despite these problems, the prospective adoptive parents wished to adopt the children, and they remained committed to adopting the children as of the date of the termination hearing, despite the continuing and perhaps increased difficulties described by the parents. There is no evidence that the adoption will not take place as soon as the legal process permits. ■ This is sufficient to support the conclusion

that it is reasonably likely that the children will be adopted within a reasonable time: "[I]t is only common sense that when there is a prospective adoptive home in which the child is already living, and the only indications are that, if matters continue, the child will be adopted into that home, adoptability is established. In such a case, the literal language of the statute is satisfied, because 'it is likely' that that particular child will be adopted." (*In re Jayson T., supra,* 97 Cal.App.4th at p. 85.)

The parents, however, deduce from *Jerome D., supra,* 84 Cal.App.4th 1200, a rule that a special-needs child can be deemed adoptable only if an "approved" prospective adoptive parent exists. We disagree that this is the rule.

In *Jerome D.,* a willing prospective adoptive parent—the mother's former boyfriend, with whom the child had been placed, along with two younger half siblings—had been identified but not yet approved as of the date of termination of the mother's parental rights. (*Jerome D., supra,* 84 Cal.App.4th at pp. 1203–1205.) However, there were significant potential impediments to approval of the prospective adoptive father which the adoption assessment did not address. Among other things, he and the child's mother had a history of domestic violence in the presence of the children, which had resulted in three convictions of the prospective adoptive father. Despite having completed a domestic violence program, twice, the prospective adoptive father had again been arrested for battering the mother and for violating a restraining order. He was also " 'listed as a perpetrator' " with child protective services for emotionally abusing his nephews and niece. (*Id.* at p. 1203.) The court held that under these circumstances, the mere fact that an identified person had expressed willingness to adopt the child was not sufficient to support a finding that the child was adoptable. (*Id.* at pp. 1204–1206.) As we understand *Jerome D.,* it was not the fact that the prospective adoptive father had not been approved prior to the termination of parental rights which mandated reversal of the adoptability finding, but rather the fact that there were serious impediments to his *ever* being approved. Here, the parents do not identify any potential impediments to the eventual approval of the prospective adoptive parents.

In *In re Asia L., supra,* 107 Cal.App.4th 498, on which the parents also rely, the court held that it was not sufficient that the foster parents had expressed willingness to "explore the option" of adopting the two special-needs children. (*Id.* at p. 512.) The court held that in the absence of evidence that "some family, if not [that] family" would be willing to adopt the children, the evidence failed to demonstrate that there was a likelihood that the children would be adopted. (*Id.* at p. 512.) Thus, there too, the issue was not whether there was an "approved" adoptive family available but whether

the foster parents were sufficiently committed to adopting the children to support a finding of adoptability. That is clearly not the case here.

## DISPOSITION

The judgment is affirmed.

Ramirez, P. J., and King, J., concurred.

A petition for a rehearing was denied June 12, 2009, and appellants' petitions for review by the Supreme Court were denied July 29, 2009, S173943. Corrigan, J., did not participate therein.