Filed 8/29/14  E.H. v. Superior Court CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| E.H.,<br><br>        Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>        Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Real Party in Interest. | B255970<br><br>(Los Angeles County<br>Super. Ct. No. CK57697) |

ORIGINAL PROCEEDINGS in mandate.  Veronica McBeth, Judge. Petition  denied.

Mitchell Keiter, under appointment by the Court of Appeal, for Petitioner.

No appearance for Respondent.

John F. Krattli, County Counsel, Dawyn Harrison, Assistant County Counsel, William D. Thetford, Deputy County Counsel, for Real Party in Interest.

E.H. (mother) challenges the juvenile court's order terminating reunification services and setting a permanency hearing under Welfare and Institutions Code section 366.26[1] for her son S.H.  Mother contends the juvenile court improperly focused on the child's special needs and did not find that his return to her care would pose substantial risk of detriment.  We disagree with mother's characterization of the court's findings and deny the petition.

## FACTUAL AND PROCEDURAL SUMMARY

We have reviewed the family's dependency history in previous opinions.[2]  As relevant here, in 1998 father was convicted of willful cruelty to mother's child from another relationship, and mother failed to reunify with that child.  The parents' two oldest children together, A.H. and Wi.H., were dependents of the court between 2005 and 2007, due to father's earlier abuse of their half sibling.  Between 2008 and 2010, the parents' third child, B.H., was a dependent due to medical neglect.

Since 2011, the parents' six oldest children have been the subjects of an open dependency case, based on sustained allegations that father hit A.H. in the face with his fist, mother failed to protect her, and both parents regularly gave her beer to drink.  S.H., the parents' seventh child, was declared dependent of the court after his birth in 2012, based on the sustained allegations in his older siblings' case.  The parents were ordered to receive reunification services and to complete parenting education and individual counseling.  In March 2013, the court terminated reunification services as to the six older children, but did not return the children to the parents' custody due to their insufficient

---

[1] Statutory references are to the Welfare and Institutions Code.

[2] See *In re A.H.* (July 16, 2014,  No. B251288 [nonpub. opn.]); *In re S.H.* (Dec. 11, 2013, Nos. B245942 & B248323 [nonpub. opns.]); *In re A.H.* (July 20, 2012, No. B236022 [nonpub. opn.]); *In re B.H.* (July 31, 2009, No. B211691 [nonpub. opn.]; *Jeffrey H. v. Superior Court* (June 13, 2006, No. B189786 [nonpub. opn.]).  S.H.'s father, J.H. (father), is not a party to this proceeding, but will be referred to as needed.

2

progress, father's disruptive behavior through most of the case, and mother's continued submissiveness to his control.

After the parents' visits were liberalized to unmonitored in March 2013, two-year-old El.H. allegedly started acting out in an aggressive manner. In April 2013, five-year-old J.H. and three-year-old Wa.H. reported that father showed them a gun and threatened to kill their foster mother for placing them in time outs. Mother reportedly told father to "shut up," to which he replied, "you shut up." The Department of Children and Family Services (DCFS) filed petitions under section 388 to revert to monitored visits for all children.

In August 2013, mother gave birth to the couple's eighth child, Em.H., and father informed the social worker that he was willing to do whatever was necessary to have the children placed with mother. At a team decision meeting in September, mother admitted she had been a victim of domestic violence throughout her marriage to father, and she checked into a domestic violence shelter. In October, S.H. was referred for regional center assessment because he frequently banged his head against hard surfaces, communicated by screaming, did not chew his food, and had problems sleeping. He began receiving services in November. Also in November, the court terminated father's reunification services as to S.H., but continued services for mother. The court ordered father's visits with all children to be monitored. Mother was allowed unmonitored visits at the domestic violence shelter and monitored visits outside the shelter. After November, father no longer visited S.H.

S.H.'s contested 18-month hearing took place in April 2014. Mother testified at the hearing, and her testimony at the January 2014 disposition hearing as to Em.H. was incorporated by reference. Mother claimed father had emotionally and verbally abused her throughout the marriage, but had slapped her only once, in April 2013, and that incident was the reason she left him. She had not seen him, outside of court, since then, and had only sent him a message about Em.H.'s birth. Based on court records, mother believed father was in the state of Georgia. She claimed she understood that her

3

continuing relationship with father was the main problem in the case and had filed for divorce in early April 2014.

Although mother had been ordered to complete age appropriate child parenting classes, she completed only two online courses, neither of which was approved by DCFS. Mother received individual counseling intermittently since November 2012 and claimed to be enrolled in counseling at the Pasadena Mental Health Center at the time of the hearing. DCFS had been unable to confirm her enrollment there or at Hillsides Mental Health for Parenting. Before she admitted to being a victim of domestic violence in September 2013, mother's counseling explored the problems caused by father's disruptive behavior in the case. She underwent some counseling at the domestic violence shelters, having to do with the events that brought her there and with her family history patterns. Her most recent counseling explored making positive future changes to break the cycle of domestic violence, being a single parent, and creating a safety plan.

Mother was aware S.H. was receiving regional center services, but had not attended any of his assessment appointments, had only read the initial report, and had only recently become aware that he banged his head.

Mother's counsel urged the court to return S.H. to mother, emphasizing that she had been allowed unmonitored visits at her placement in the domestic violence shelter, which showed "some faith" in her as a parent, and that she had been compliant with her plan. Counsel noted that mother had continuously attended individual counseling, was enrolled in a parenting class, and had taken clear steps to be a single mother and to protect her child.

S.H.'s counsel was less comfortable with returning the child to mother outright, noting that mother had not had unmonitored visits recently and had not yet completed her parenting and domestic violence classes. Counsel suggested the court terminate mother's reunification services, but had no objection to her having unmonitored visits at the child's most recent placement, or even moving in with the caregiver, because mother "might be able to get [S.H.] to her for the permanent plan."

4

DCFS's counsel pointed to the family's long dependency history, which began with father's severe physical abuse of a child whom mother failed to protect, and most recently involved the children's removal again due to physical abuse by father and failure to protect by mother. According to counsel, mother had been unable "to articulate the fact that . . . her failure to protect her children [was] her key issue[]." DCFS's counsel also noted mother had monitored visits with S.H., was not aware of all his special needs, and had not been able to show "she can handle it and see it through." DCFS's recommendation was that the court terminate reunification services and not allow mother to move in with the child's caregiver.

The court found father's child abuse was the most significant aspect of the case, yet mother stayed with him "year after year, child after child." It commended mother for having filed for divorce, but added "you will excuse me if I'm just a little skeptical of this coming up right before this hearing, and that it has not happened earlier." The court noted that although father was in another state at the time of the hearing, he had been "visiting" as late as November 2013 and thus had "not been gone for very long." The court stated: "I wish more things had happened in the last 18 months. . . . I hope mother . . . has really understood that her children have to be protected from their father. . . . [B]ut I have not even had an unmonitored visit to know that that is what she is going to do because last time she had an unmonitored, she let the children around him." The court noted it would have been willing to overlook some of the problems with mother's compliance—that she had not recently seen a licensed therapist and that she had completed unapproved online classes—if she had not allowed father "to still come around." It mentioned S.H.'s special needs, which mother had not been able to acknowledge. The court concluded that "[t]here's no way I could release your child to you at this time because of all of that."

The court terminated mother's reunification services and scheduled a section 366.26 hearing. It encouraged mother to learn about S.H.'s problems and assumed she would file a section 388 petition. The court ordered DCFS to apprise mother of S.H.'s every appointment and to allow her to attend all his programs and services, with S.H.'s

5

caregiver as monitor.  The court gave DCFS discretion to allow mother unmonitored visits at the caregiver's home, reiterating, "I want to make sure . . . mother . . . is determined to keep the father outside of her life, and away from her children, that's what I want to see.  I'm not convinced of that because it has not been a long enough period of time."

Mother petitioned for extraordinary writ review of the court's order.

## DISCUSSION

At the 18-month hearing, "the court shall order the return of the child to the physical custody of his or her parent . . . unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a); see also *Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.)  We review the record for substantial evidence whether a child would be at substantial risk of detriment if returned to the parent's custody. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400–1401.)

Mother argues the court did not make an express finding of detriment, but such a finding may be implied if supported by substantial evidence.  (See *In re A.S.* (2009) 180 Cal.App.4th 351, 363, see also *In re Corienna G.* (1989) 213 Cal.App.3d 73, 83–84.) Mother claims that she successfully had completed the reunification process, but the court improperly "faulted" her for failing to participate in S.H.'s regional center services, which were not included in her reunification plan.  That mischaracterizes the court's findings.

The court noted several problems with mother's compliance, and indicated its willingness to overlook some of them, such as her completion of unapproved online parenting courses, or her participation in counseling with unlicensed therapists.  Had those been the only problems, mother may have been in substantial compliance with her case plan. (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1343.)  But what the court found particularly troubling was the fact that mother had not had a regular

6

unmonitored visit with S.H. since father threatened to kill one of the foster parents in April 2013. Those threats reportedly occurred during the children's unmonitored overnight visit with mother. Mother's professed ignorance of the threats conflicted with her children's report that the threats were made in her presence.

Determination of mother's credibility is the province of the dependency court, and we review the record in the light most favorable to that determination. (See *In re I.J.* (2013) 56 Cal.4th 766, 773.) Mother contends the court did not question her credibility, but the record indicates otherwise. As mother acknowledges, the court questioned her motive for filing for divorce shortly before the hearing. The court also expressly questioned her determination to keep father out of her life, finding father had not been gone long enough and mother had not had unmonitored visits.

The court's skepticism was reasonable in light of the family's long dependency history. As the court found, mother stayed with father for many years despite the sustained allegations of child abuse against him, and repeatedly allowed him around the children even after she had been ordered not to do so. The parents' more recent conduct appears to be strategic. Although mother claims to have left father after he slapped her in April 2013, she did not admit to domestic violence until September of that year, after her eighth child with father was born and after father had expressed his willingness to do anything to help her regain custody of the other children. Her attorney acknowledged that mother went to a domestic violence shelter in an attempt to keep her newborn baby. Under the circumstances, the court was justified in questioning whether mother's declared resolve to protect the children from father was genuine, or whether it was strategically aimed at regaining custody of her children.[3]

Mother correctly points out that the court mentioned her insufficient knowledge of S.H.'s special needs among the reasons for not releasing the child to her. However, she

---

[3] DCFS points out that there is no evidence mother had addressed the issue of A.H.'s alcohol consumption, the other issue that originally justified the children's removal. That issue was not mentioned at the hearing, and it did not form part of the court's decision to terminate reunification services.

incorrectly concludes that the court unfairly terminated her services for failing to address problems that had not been included in the reunification plan. As we explained, the court terminated mother's reunification services because at the 18-month hearing it was not convinced that mother honestly intended to protect the children from father, or in other words, that she had "overcome the problem that led to removal in the first place." (*Blanca P. v. Superior Court*, *supra*, 45 Cal.App.4th at p. 1748.)

The court may address new impediments to reunification by modifying the reunification plan. (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008.) But "the turning point at which the child's interest may outweigh that of the parent is reached no later than 18 months after the child has been removed from the parental home, because the maximum length of time that reunification services are provided to the parent is 18 months. [Citations.]" (*In re Jasmon O.* (1994) 8 Cal.4th 398, 420.) The court specifically declined to extend mother's services past the 18-month hearing due to the child's need for stability, and mother contends that extending her services past that point is not the issue here. The issue, she claims, is whether the court could terminate her services based on her failure to address the child's special needs outside the case plan. The court expressed uncertainty as to the reason why mother had not participated in all of the child's regional center services, suggesting she may not have been made aware of them. It cannot be said that the court "faulted" mother for failing to participate in those services.

Mother argues the court improperly required her to participate in services after it terminated family reunification and attempted to use a section 388 petition to evaluate her continued progress. We disagree. A section 388 petition may be used to show changed circumstances before the section 366.26 hearing. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) The court assumed mother would file a section 388 petition, and essentially told her what she needed to do in order to succeed on the petition.

After reunification services are terminated, visitation is to continue absent a finding it would be "detrimental to the child." (§ 366.22, subd. (a); *In re Luke L.* (1996) 44 Cal.App.4th 670, 679.) The court ordered DCFS to allow mother to visit with S.H. at

8

his appointments, with the caregiver serving as a monitor, and gave DCFS discretion to allow her unmonitored visitation at the caregiver's home. In doing so, the court noted S.H. "may have difficulty finding a permanent home" due to his special needs. The court's earlier implied finding of a substantial risk of detriment from the outright return of S.H. to mother's custody was not inconsistent with its later conclusion that increased or liberalized visitation with mother may be in the child's best interest in case his adoption proved difficult.[4] (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309 [after reunification services are terminated, focus is on child's best interest, including interest in stability and permanency].)

The court's findings are supported by substantial evidence and the order is proper.

**DISPOSITION**

Mother's petition is denied.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                        EPSTEIN, P. J.
We concur:

        WILLHITE, J.

        MANELLA, J.

---

[4] Although DCFS had reported S.H. was adoptable, he had been removed from the prospective adoptive parents' home due to his special needs. (See *In re K.B.* (2009) 173 Cal.App.4th 1275, 1292–1293 [special needs child who is not generally adoptable may be found adoptable if likely to be adopted by identified prospective adoptive family within reasonable time].)

9