Filed 10/15/13  In re David R. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re DAVID R. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SAMANTHA M.,<br><br>Defendant and Appellant. | F066425<br><br>(Super. Ct. Nos. 516095, 516096, 516097, 516098)<br><br>**OPINION** |

-ooOoo-

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Stanislaus County.  Ann Q. Ameral, Judge.

Catherine C. Czar, under appointment by the Court of Appeal, for Defendant and Appellant.

John P, Doering, County Counsel, Carrie M. Stephens, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

_____

[*] Before Wiseman, Acting P.J., Levy, J., and Kane, J.

Samantha M. (mother) appeals from the juvenile court's order terminating her parental rights. (Welf. & Inst. Code, § 366.26.)[1] Mother contends that (1) the record lacks sufficient evidence to find her children adoptable, and (2) the court failed to ensure meaningful compliance with the Indian Child Welfare Act (ICWA). (25 U.S.C. § 1901 et seq.) We disagree and affirm the court's order.

### FACTUAL AND PROCEDURAL HISTORIES

Mother's children, David R., Madison R., Shawna R., and John R. III are the subjects of this case. Charles R. is the presumed father of David and Madison. John R. is the presumed father of Shawna and John III. Jeff B. is an alleged father of Madison. Jose F. and Charles are alleged fathers of Shawna.

Mother came to the attention of the Stanislaus County Community Services Agency (Agency) on May 6, 2011, when the Agency received a referral that mother had been arrested on a School Attendance Review Board warrant related to David not attending school regularly. It was reported that, at the time of arrest, mother appeared to be under the influence of drugs and was homeless. A social worker investigated the referral and learned that the previous day, mother had left David to watch his two-year-old half-sibling John III in a motel room where the family was staying for the night. Mother left the motel at 8:00 a.m. with Madison and Shawna and did not return. At 11:00 a.m., a motel employee contacted a relative who picked up David and John III from the motel.

On May 10, 2011, the Agency initiated this case by filing a juvenile dependency petition on behalf of all four children. Two days later, it filed an amended petition alleging failure to protect. (§ 300, subd. (b).) The Agency alleged that mother had a

---

[1]Subsequent statutory references are to the Welfare and Institutions Code unless otherwise stated.

2.

history of substance abuse, including a 10-to-11 year history of methamphetamine use. She also had a history with the Agency, including five substantiated reports of neglect.

The juvenile court found a prima facie showing that the minors were persons described in section 300 and ordered them temporarily detained.

David, Madison, Shawna, and John III were placed with their maternal aunt, Jennifer M. and her significant other, Julie S. The minors began living with Jennifer on May 6, 2011. According to a jurisdiction/disposition report prepared by the Agency, David told a social worker, "I'm being treated good in Aunt Jennifer and Julie's home," and Madison said, "I like living in Aunt Jennifer's house and we have not had any problems."

The jurisdiction/disposition report incorporated many supporting documents, which were provided to the court as attachments to the report. Among these supporting documents was attachment L, a "delivered service log," with entries from social workers regarding work they had done on the case. In one entry, social worker Maria Pasillas wrote about a home visit to the aunt's house that occurred on May 23, 2011. She wrote the home "appeared clean and organized." Pasillas also logged the following: "I met with Julie and discussed her live scan[2] results. I asked that she provide me [with] an exemption request, 3 reference letters, letter of explanation and a police report. I granted her 2 weeks to turn in all the above documents."

With respect to ICWA matters, mother reported there was Cherokee ancestry in her family and Charles reported there was Cherokee and Choctaw ancestry in his family.

_____

[2]"Live Scan" refers to an electronic fingerprinting system used to check an individual's criminal background. (*In re M.L.* (2012) 205 Cal.App.4th 210, 215, fn. 3; see Health & Saf. Code, § 1522.04.) Prior to placing a child in the home of a relative, a social worker must visit the home to ascertain the appropriateness of the placement. (§ 361.4, subd. (a).) A criminal records check of all persons over 18 years of age living in the home is also required. (*Id*., subd. (b).) This notation appears to document Pasillas conducting the required home visit and discussing Julie's criminal background check with her.

John reported no American Indian ancestry in his family. A "Notice of Child Custody Proceeding for Indian Child," ICWA-030 form, was sent to the Bureau of Indian Affairs and the tribes identified.

The Agency recommended that the juvenile court adjudge the minors dependents of the court and order reunification services for mother, Charles, and John.

At the hearing on jurisdiction, the juvenile court found the allegations of the amended petition true. In a subsequent hearing on disposition, the court found that returning the minors to the custody of mother would create a substantial risk of detriment to their physical and emotional well-being and continued placement outside the home was necessary and appropriate. The court found that mother's progress toward alleviating or mitigating the causes necessitating placement had been "limited." The court ordered reunification services for mother and the presumed fathers. Mother was required to participate in a clinical assessment.

In a status review report filed on March 7, 2012, the Agency recommended terminating services for mother and John. The Agency also reported that it had received responses from all the tribes notified, and the minors were not Indian children; it recommended the court make a finding that ICWA did not apply.

On April 5, 2012, at a six-month review hearing, the juvenile court found that the return of the minors to the custody of the parents would create a substantial risk of harm to the minors and their current placement was necessary and appropriate. Mother's progress toward alleviating or mitigating the causes necessitating placement was deemed "minimal." At the hearing, the Agency changed its recommendation regarding mother, recommending that she receive reunification services. The court ordered continued reunification services for mother and Charles and terminated services for John. The court also found that ICWA did not apply to David, Madison, Shawna, and John III. At the end of the hearing, the court advised mother and Charles they had 60 days in which to file an appeal if they had any objections to the orders made that day.

4.

The Agency prepared a status review report for the 12-month review hearing. In this report, the Agency recommended terminating family reunification services for mother and Charles and setting a section 366.26 hearing to establish a permanent plan of adoption for the minors. Mother had weekly visits with the minors, which were described as "chaotic," as mother's "lack of parenting skills [became] apparent fairly quickly." The report noted that the minors had been placed "in the approved AB 1695 Relative Placement Home of the Maternal Aunt, Ms. Jennifer M.," since May 6, 2011.[3]

A contested 12-month review hearing was held on August 2, 2012. Charles's attorney made an offer of proof that Charles would testify that he had not been participating in his case plan because it was his belief that nobody ever helped him, the caregivers (Jennifer and Julie) had "brainwashed David and Madison into saying untrue things about him .…" Mother testified that she "entered rehab" in May or June and she had not been "clean" before that. She admitted she had tested positive for opiates on July 2, 2012. Mother testified that at her visit with the minors the previous day, Madison told her that she did not want to live with mother and she was happy with Aunt Jennifer. Mother told David that "if they wanted to stay and live with Jennifer and Julie, … I will help them, if I can sign papers, you know, to where Jennifer and Julie get legal, temporary guardianship or whatever until they turn 18, if that's truly what they wanted."

---

[3]Assembly Bill No. 1695 added section 362.7 and amended various other statutes related to foster homes. The bill was intended "to clarify that California's relative caregiver approval process employs the same standards used to license foster care homes in accordance with the federal Adoption and Safe Families Act of 1997 (P.L. 105-89) .…" (Stats. 2001, ch. 653, § 1, p. 4111.) For example, the bill amended section 309, subdivision (d), to add: "The standards used to evaluate and grant or deny approval of the home of a relative or a nonrelative extended family member … shall be the same standards set forth in regulations for licensing foster family homes." (Stats. 2001, ch. 653, § 8, p. 4116.) Thus, "approved AB 1695 Relative Placement" refers to a home that has met these statutory requirements for placement of a foster child.

At the end of the hearing, the juvenile court terminated family reunification services for mother and Charles and set a section 366.26 hearing. Mother's progress toward alleviating or mitigating the causes necessitating placement was found to be "poor."

The Agency prepared a "366.26 WIC Report" for the permanency planning hearing, recommending that the court terminate parental rights and establish a permanent plan of adoption for the minors. David was developing within average range for his age. He was diagnosed with extreme nearsightedness and it was recommended that he avoid activities that could damage his fragile retinas. David was currently in the eighth grade. He had become much more confident over the prior year, and he was enjoying school and had a lot of friends. The caregivers reported that he had a 3.99 grade point average. Madison was developing within average range for her age. She reported feelings of depression and was receiving individual counseling services. Madison was in the third grade. She also had a lot of friends, enjoyed school, and was earning above-average grades. Shawna was developing within average range for her age and meeting all age-appropriate milestones. She had started kindergarten, and her caregivers reported that she appeared to enjoy school and she made friends easily. John III was developing within average range for his age and meeting all age-appropriate milestones. The report again noted that the minors were placed in "the approved AB 1695 Relative Placement Home of their Maternal Aunt."

The Agency addressed the likelihood of adoption by the minors' current caregivers:

> "It is extremely likely the children will be adopted if the Court terminates the parental rights. As reported above, the children are currently placed with their maternal aunt and her family, Ms. Jennifer M. Ms. Jennifer M. has expressed her commitment to both social workers Croom and Mincey. She loves all the children and is willing to do whatever necessary to ensure they are safe and happy. The children have already integrated themselves in the family and are very comfortable with their life."

6.

The report provided the following information on the prospective adoptive parents:

"Social History:

"The prospective adoptive parents for these children are [Jennifer] and [Julie]. [Jennifer] is the children's maternal aunt. She is a forty-year-old Hispanic female. [Julie], her partner of many years, is a forty-one year old Hispanic female. [Jennifer] has three biological children, two of whom are adults and one of whom is a 17-year-old. Her 20-year-old son and 17-year-old son live in the family home. [Jennifer] is employed full time as an equipment operator for a major local industry, and [Julie] is employed by the same company in a part-time capacity. [Jennifer] and [Julie] reside in a well-established neighborhood in Stanislaus County. Their home is clean, well-organized and appropriate for raising children. Both prospective adoptive parents are in good health and enjoy an active, child-centered lifestyle.

"Results of Criminal History Clearance:

"[Jennifer], her 20-year-old son, and [Julie] completed livescan fingerprinting for adoption purposes on November 20, 2012. All the above mentioned adults completed livescan fingerprinting at the time the children were taken into Protective Custody and prior to the children being placed in their home. Although, the results are not currently available as of the filing date of this report, since they have already submitted fingerprinting without any concerns, the undersigned is confident the livescan fingerprint results would not prohibit them from taking placement of the children.

"Results of CWS History Clearance:

"[Jennifer], her 20-year-old son, and [Julie] completed livescan fingerprinting for adoption purposes on November 20, 2012. The results of the Child Abuse Index search had not yet been received at the time of the filing of this report. However, all the adults completed livescan fingerprinting prior to placement and the Child Abuse Index results did not prevent the prospective adoptive parents from taking placement of the children. A review of CWS/CMS indicates that [Jennifer] was the subject of two referrals, one in 2009 and one 2010, for general neglect of one of her children. In both instances, the referrals resulted in a finding of 'Unfounded.'"

7.

The report also noted that Jennifer and Julie "wish to adopt these children because they have known them since birth and cared for them off and on their entire lives," and they "have been meeting the children's needs since May of 2011, a period of over eighteen months."

On December 6, 2012, the juvenile court held a contested section 366.26 hearing. Mother testified that it would be harmful to her children to be adopted by Jennifer and Julie. She said the children "are manipulated a lot verbally and threatened a lot by the both of them." Asked what would be in her children's best interests, mother responded, "Not to be living with Jennifer. I think Julie would [be an] okay sole caregiver for my kids, but not Jennifer. Jennifer—you guys don't know my sister." Charles agreed with mother's testimony and further said "Jennifer is an abusive woman."

David testified that he wanted to be adopted by Jennifer and Julie. They were providing him a better home than his previous living conditions. He also said mother's testimony was untrue. Madison testified that she wanted to be adopted by Jennifer and Julie. She was asked if she knew that may mean she would never see her mother again, and Madison responded, yes, and she still wanted to be adopted.

Mother's attorney argued that mother had "some very serious concerns about the long-term safety of her children in the care of their aunt." Mother requested a permanent plan that would allow her to be in her children's lives and would be "less drastic than terminating parental rights." She urged the court to consider guardianship rather than adoption.

The Agency's attorney argued that mother and Charles had not raised any relevant issues:

> "The issue for the Court is not to determine whether their foster care situation is the perfect situation. In fact, there is a bevy of case law that says the only argument that counsel for the parents can raise for a child, who is only adoptable because [there] is a specific placement, concerns legal impediments to adoption, and there has been no legal impediment to

8.

adoption. It is an emotional flurry of inconsistent and erroneous information that the parents have.

"I know the Court gave them latitude because of the nature of this hearing, but really the law says we must focus on the children, whether they are by clear and convincing evidence adoptable and whether the parents have demonstrated an exception to that.…

"So those are the concerns the Court has to address in this hearing. Not whether or not these parents disagree with the placement in these particular caretakers. The only thing that can be addressed appropriately is whether there is a legal impediment to the adoption when the children are adoptable because of a specific placement. That may be the case for the two older children because of their age and their connection to their placement. That certainly is not the case for the two younger kids.

"And I would also point out to counsel, that while these children have always been conflicted about their parents, it was Madison and David that also testified at these very early proceedings that they were afraid of their father. So, while they were at times afraid of him, they at the same time could love him, because that is what conflict in a dysfunctional family oftentimes results in. That's what this has been for these children, and we ask that the madness end and these children have the stability that they deserve .…"

After hearing the parties' evidence and arguments, the juvenile court issued its ruling, terminating the parental rights of mother and Charles. The court found that it was very likely the minors would be adopted and that mother and Charles had not met their burden of proving that termination of parental rights would be detrimental to the minors. The court also observed that David and Madison had begun to thrive since the start of the case.

Mother filed a notice of appeal on January 4, 2013.

## *DISCUSSION*

### I. *Adoptability finding*

Mother challenges the juvenile court's order terminating her parental rights, arguing there was insufficient evidence to find the minors adoptable.

The purpose of a section 366.26 hearing is to select and implement a permanent plan for the dependent child. (*In re S.B.* (2009) 46 Cal.4th 529, 532.) The Legislature's preferred permanent plan is adoption. (*In re D.M.* (2012) 205 Cal.App.4th 283, 290.) "At a section 366.26 hearing, the court must terminate parental rights and free the child for adoption if it determines by clear and convincing evidence the child is adoptable within a reasonable time, and the parents have not shown that termination of parental rights would be detrimental to the child under any of the statutory exceptions to adoption found in section 366.26, subdivision (c)(1)(B)(i) through (vi). (§ 366.26, subd. (c)(1).)" (*Id*. at p. 290.)

We review the juvenile court's order terminating parental rights for substantial evidence. This means we determine whether there is substantial evidence from which a reasonable trier of fact could find, by clear and convincing evidence, a factual basis for termination. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154.) In making this determination, we must "presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) We may not reweigh the evidence or substitute our judgment for that of the juvenile court. (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 774.)

"The issue of adoptability posed in a section 366.26 hearing focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).) "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by

10.

the prospective adoptive parent *or by some other family.*"  (*Id*. at pp. 1649-1650.)

However, "in some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*Id*. at p. 1650.)  In the latter cases, courts may determine the minor is "specifically adoptable" because of the existence of identified prospective adoptive parents; this is in contrast to the determination that a minor is "generally adoptable." (E.g., *In re Brandon T*. (2008) 164 Cal.App.4th 1400, 1408 [evidence did not support determination that minor was generally adoptable but supported finding he was specifically adoptable]; *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205 [after concluding evidence did not support finding of "general adoptability," appellate court addressed whether existence of identified prospective adoptive father would support adoptability finding]; but see *In re G.M.* (2010) 181 Cal.App.4th 552, 562 ["Not all dependency cases fall neatly into one of two scenarios:  one, the availability of a prospective adoptive parent is *not a factor whatsoever* in the social worker's adoptability assessment; or two, the child is likely to be adopted *based solely* on the existence of a prospective adoptive parent"] (*G.M.*).)  In specific adoptability cases, "the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80.)

Mother contends there was insufficient evidence to support a finding that the minors were likely to be adopted within a reasonable time.  She relies on evidence suggesting that Julie had a criminal conviction and her own concern about Jennifer and Julie's suitability as adoptive parents.  We disagree.  As mother herself recognizes, the suitability of the prospective adoptive parents is not relevant in a section 366.26 hearing. Mother has forfeited the issue of possible legal impediment to adoption, and even if she had preserved the issue, her legal-impediment argument would fail on the merits.

11.

"Once a court sets a hearing pursuant to section 366.26 to select and implement a permanent plan for a dependent child, the department must prepare an assessment (§§ 361.5, subd. (g)(1), 366.21, subd. (i)(1), 366.22, subd. (c)(1)), frequently referred to as an adoption assessment. Such an adoption assessment provides the information necessary for the juvenile court to determine whether it is likely the child will be adopted [citation] and to consequently order termination of parental rights." (*G.M.*, *supra*, 181 Cal.App.4th at p. 559.) Courts have recognized that "'[t]he assessment report is "a cornerstone of the evidentiary structure" upon which the court, the parents and the child are entitled to rely.'" (*In re Michael G.* (2012) 203 Cal.App.4th 580, 590.)

"The assessment report must address the child's medical, developmental, scholastic, mental and emotional status; analyze the likelihood the child will be adopted if parental rights are terminated; describe the efforts made to identify a prospective adoptive parent or legal guardian for the child; and provide a preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or legal guardian." (*In re Michael G.*, *supra*, 203 Cal.App.4th at p. 590.) Relevant to this appeal, the preliminary assessment of identified prospective adoptive parents must "include a social history, including screening for criminal records and prior referrals for child abuse or neglect, the capability to meet the child's needs, and the understanding of the legal and financial rights and responsibilities of adoption .…" (§§ 361.5, subd. (g)(1)(D), 366.21, subd. (i)(1)(D), 366.22, subd. (c)(1)(D).) "A child's current caretaker may be designated as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process. (§ 366.26, subd. (n)(1).)" (*G.M.*, *supra*, 181 Cal.App.4th at p. 559.)

Here, the Agency's "366.26 WIC Report" contained a preliminary assessment of the prospective adoptive parents, Jennifer and Julie. The preliminary assessment properly considered their social history, including criminal and child welfare service

history.  Jennifer, Julie, and Jennifer's adult son had submitted fingerprints to Live Scan for adoption purposes in November 2012, but the results were not available.  It was noted that they had completed Live Scan fingerprinting at the time the minors were taken into protective custody, and "since they have already submitted fingerprinting without any concerns, the undersigned is confident the livescan fingerprint results would not prohibit them from taking placement of the children."  The Agency also reported that Jennifer's home was an "approved AB 1695 Relative Placement."  Considered together with other evidence in the record—including evidence that Jennifer and Julie wished to adopt all four minors, the older children, David and Madison, wanted to be adopted by them, and Jennifer and Julie had been meeting the minors' needs for the previous 18 months—there was substantial evidence to support the juvenile court's determination that the minors were likely to be adopted within a reasonable time.

Mother acknowledges that questions regarding suitability to adopt are not relevant in a section 366.26 hearing.  (*G.M.*, *supra*, 181 Cal.App.4th at p. 563.)  Nonetheless, she goes on to claim there was a "continuing concern that Jennifer and Julie may not be suitable adoptive parents."  As one court observed, "If inquiry into the suitability of prospective adoptive parents were permitted in section 366.26 hearings, we envision that many hearings would degenerate into subjective attacks on all prospective adoptive families in efforts to avoid termination of parental rights."  (*In re Scott M.* (1993) 13 Cal.App.4th 839, 844.)  Mother proves this point by repeating her subjective concerns about her sister as a caregiver.  Her concerns about the prospective adoptive parents, however, do not vitiate the substantial evidence in the record supporting the finding that the minors were adoptable.

Mother also states that Jennifer and Julie had not had an approved adoptive home study, but this fact does not support her claim.  She cites no authority for the proposition that an approved adoptive home study is required to make a finding of adoptability.  (Cf. *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527 ["mother cites no authority for her

13.

suggestion that, in a specific-adoption case, termination of parental rights must be denied in the absence of evidence showing a home-study approval or back-up plan in case the prospective adoption fails"]; *In re K.B.* (2009) 173 Cal.App.4th 1275, 1293 [finding that child is specifically adoptable does not require showing that prospective adoptive parent has been "approved"]; *In re Brandon T.*, *supra*, 164 Cal.App.4th at p. 1410 ["parental rights may be terminated to a specifically adoptable child regardless of whether a home study has been completed"].)

Mother's primary argument is that Julie "had what appears to be an unaddressed criminal conviction that may prevent approval and thus constitute a legal impediment to adoption." Mother relies on social worker Pasillas's log entry from May 2011 (which can be found in attachment L to the Agency's jurisdiction/disposition report, filed on June 3, 2011). Documenting her home visit with the prospective relative placement, Pasillas wrote that she met with Julie and discussed her criminal background check. Pasillas asked that Julie provide her with an exemption request, three reference letters, a letter of explanation, and a police report. Julie was given two weeks to provide the documents. Mother asserts that Pasillas's log entry "suggests Julie had a criminal conviction which may have disqualified her as an adoptive parent." This argument has been forfeited.

At the contested section 366.26 hearing, mother did not raise the issue of possible legal impediment to adoption. She argued only that her sister Jennifer was not a suitable prospective adoptive parent. Mother voiced no concerns about Julie, opining that Julie would be an "okay sole caregiver for my kids." Now, for the first time, mother speculates that evidence of Julie's criminal conviction may raise a legal impediment to adoption because the conviction may fall within the list of criminal convictions that would disqualify her from adopting. (Fam. Code, § 8712.)[4]  If mother had sought to

---

[4]Family Code section 8712, subdivision (b), provides that "the criminal record, if any, shall be taken into consideration when evaluating the prospective adoptive

14.

introduce evidence regarding a potential legal impediment to adoption, the juvenile court would have been obligated to admit it. (*G.M.*, *supra*, 181 Cal.App.4th at p. 561.) But mother did not raise the issue that Julie's prior criminal conviction might preclude her from adopting.

In *G.M.*, *supra*, 181 Cal.App.4th at page 560, the mother raised, for the first time on appeal, the issue of possible legal impediment to the prospective adoptive parent's adoption of the mother's two children. Family Code section 8603 provides that a married person who is not lawfully separated cannot adopt without the spouse's consent. In *G.M*, the mother argued that the prospective adoptive parent, the minors' great-aunt, might not be eligible to adopt because there was evidence that she had been married and there was no documentation showing a lawful separation. Therefore, it was possible that the great-aunt was not lawfully separated from her husband and could not get his consent. (*G.M., supra,* at p. 560.) Our court recognized that whether the great-aunt was eligible to adopt would have been relevant at trial; mother could have, for example, asked either the social worker or the great-aunt about whether she was lawfully separated or could obtain her husband's consent to an adoption. (*Id.* at pp. 562-563.) The mother, however, made no such effort at trial. As a result, the "mother failed to properly preserve for appellate purposes her claim of trial court error." (*Id.* at pp. 563-564.) Likewise, in this case, mother failed to raise the legal-impediment question in the juvenile court. Consequently, she may not raise it for the first time on appeal.

Mother tries to get around her failure to raise the issue of possible legal impediment by framing her appellate claim as a challenge to the sufficiency of the

---

parent …." In addition, certain listed felonies preclude approval for adoptive placement. These include felony convictions for child abuse or neglect, spouse abuse, crimes against a child, crimes involving violence, including rape, sexual assault, or homicide, but not including other physical assault and battery. (Fam. Code, § 8712, subd. (c)(1)(A).)

evidence.  We have concluded, however, that substantial evidence in the record supports the determination that the minors were adoptable.

Finally, even if mother had preserved the issue on appeal, it would fail.  Pasilla referred to an exemption request.  A child may not be placed in a relative placement home where an adult has a criminal record unless and until a criminal records exemption has been granted by the county.  (§ 361.4, subd. (d)(2).)  The exemption must be "based on substantial and convincing evidence to support a reasonable belief that the person with the criminal conviction is of such good character as to justify the placement and not present a risk of harm to the child .…"  (*Ibid*.)  Although there is no further reference to Julie's criminal conviction or exemption request in the record, since the minors remained in Jennifer and Julie's home for 18 months, we presume that, if it was necessary, Julie was granted a criminal records exemption.  (*Ibid.*; Evid. Code, § 664.)  We also observe that the Agency reported to the court on at least two occasions that Jennifer and Julie's home was an "approved AB 1695 Relative Placement," implying that the home complied with all statutory requirements.

As the Agency points out, the list of crimes that would be a legal impediment to adoption under Family Code section 8712 is almost identical to the list of crimes that preclude foster child placement.  (§ 361.4; Health & Saf. Code, § 1522, subd. (g)(1).)  Since Julie presumably was able to obtain a criminal background exemption for placement, her criminal conviction would most likely not bar her from adopting either.  There are some crimes for which an exemption is possible under Health and Safety Code section 1522 (for foster care licensing) but no exemption is provided in Family Code section 8712 (for adoption).  These crimes are mayhem, any felony punishable by death or imprisonment in the state prison for life, and any felony in which the defendant inflicts great bodily injury.  (Health & Saf. Code, § 1522, subd. (g)(1)(A)(ii); Pen. Code, § 667.5, subd. (c)(2), (7), (8).)  A foster care exemption for conviction of one of these crimes requires that the person seeking the exemption "has been rehabilitated as provided in

16.

Section 4852.03 of the Penal Code, has maintained the conduct required in Section 4852.05 of the Penal Code for at least 10 years, and has the recommendation of the district attorney representing the employee's county of residence, or if the employee or prospective employee has received a certificate of rehabilitation pursuant to Chapter 3.5 (commencing with Section 4852.01) of Title 6 of Part 3 of the Penal Code."  (Health & Saf. Code, § 1522, subd. (g)(1)(A)(ii).)

If Julie had a criminal conviction for one of these offenses, the social worker would have asked Julie for evidence supporting this type of exemption.  Here, however, the social worker did not ask Julie for a recommendation from the district attorney or any other documents indicating that Julie's criminal conviction was the type that would require such extensive evidence of rehabilitation.  In other words, contrary to mother's argument, the record does not support an inference that Julie has a criminal conviction that would be a legal impediment to adoption.

## II.    *Adequacy of ICWA notice*

Mother also contends that the court failed to ensure meaningful compliance with ICWA.  The Agency provided notice to the tribes identified by mother and Charles in a 10-page "Notice of Child Custody Proceeding for Indian Child," ICWA-030 form. Mother complains about the information provided for the biological father, Charles. Regarding Charles, on page two of the notice, the Agency entered "Does not apply" for the tribe or band, but on page five, it entered information about the biological father's biological grandparents.  His grandmother was "Iva Adler (Married)  [¶]  Hood (Married)," a member of the Choctaw tribe, and his grandfather was "Thomas Hood" a "Cherokee w/grandma of great grandma."  On appeal, mother argues that the notice was misleading and may have led to incorrect responses from the tribes.  We do not consider this contention.

In *In re Pedro N.* (1995) 35 Cal.App.4th 183, 185, 189, we held that a parent who timely fails to challenge a juvenile court's action regarding ICWA is foreclosed from

raising ICWA issues, once the juvenile court's ruling is final, in a subsequent appeal from later proceedings. Here, the juvenile court issued its finding on April 5, 2012, that ICWA did not apply to the minors. At that time, the court advised mother of her right to file an appeal within 60 days if she had any objections to its orders. Since she failed to raise the ICWA issue in a timely manner, mother has forfeited the issue. We decline mother's invitation to revisit or reject *Pedro N.*

## *DISPOSITION*

The juvenile court order is affirmed.