Filed 12/11/15  In re R.M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re R.M. et al., Persons Coming Under the Juvenile Court Law. | D067837 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3708A-C) |
| v. | |
| J.M. et al, | |
| Defendants and Appellants. | |

APPEAL from judgments and orders of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant J.M.

Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant R.M.

Thomas E. Montgomery, County Counsel, John E. Phillips, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel for Plaintiff and Respondent.

Appellants J.M. (Mother) and R.M. (Father) each appeal a juvenile court judgment terminating their parental rights to their three daughters, R.M. (born Feb. 2002), E.M. (born Jan. 2007), and J.M. (born Mar. 2009; together, the children). Adoption was selected as the children's permanent plan. (Welf. & Inst. Code, § 366.26; all further statutory references are to this code unless noted.) Mother also appeals the order denying her modification motion, which sought placement of the children with her with maintenance services, or additional reunification services. (§ 388.) She argues the court did not properly exercise its discretion in evaluating her showing of significantly changed circumstances, occurring after her reunification services were terminated in November 2014. Father joins in the arguments made by Mother.

In appealing the judgment, both Mother and Father contend that the evidence, including the adoption assessment report prepared by the San Diego County Health and Human Services Agency (the Agency), did not support the juvenile court's findings of general and specific adoptability for this sibling set. (§ 366.21, subd. (i)(l).) The parents further challenge the sufficiency of the evidence to support the court's finding that no exception to adoption preference applied, i.e., beneficial parent-child relationships. (§ 366.26, subd. (c)(1)(B)(i); *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)

2

The Agency contends that the record does not show any abuse of judicial discretion or lack of supporting evidence. Counsel for the children joins in those arguments. The record supports the juvenile court's determinations and we affirm the judgments and order.

I

*FACTUAL AND PROCEDURAL BACKGROUND*

A.  Jurisdiction, Disposition, and Review Hearings

Mother and Father were married in 2001 and R.M. was born in 2002. From 1998 to 2002, Father served with the United States Marine Corps, partly overseas, and he incurred brain and leg injuries and posttraumatic stress disorder. After he returned, Mother was arrested in January 2003 for spousal battery, and Father was arrested for the same offense in September 2004. In November 2006, there were more domestic violence incidents between the parents, and Father physically abused R.M. The Agency offered the parents voluntary child protective services (classes and therapy), lasting through September 2007.

In July 2009, more domestic violence between the parents occurred and another voluntary case was opened by the Agency. They received services for about 10 months and somewhat reduced their violent confrontations. However, they consistently reunited, when the problems occurred again.

The Agency filed the current petitions for the children in August 2013, after Mother or someone on her behalf called 911 to report she was injured during a fight with Father, at their home and in front of J.M., who was four at the time. Father choked

3

Mother, fracturing several of her neck vertebrae and causing her to pass out briefly. After Mother awoke and went over to her parents' home, she told emergency responders that Father had punched her in the face and dragged her by the hair into the bedroom. She reported this type of violence had happened approximately 10 times before.

As Mother received emergency medical treatment, she told the doctor that she felt a snap in her neck after her husband put her in a choke hold and threw her to the ground. The doctor recommended that Mother wear a neck brace for two to three months, noting it was a serious injury that could have been fatal. Father was arrested but released.

In August 2013, the children were detained together at the home of the maternal grandparents, and Mother stayed there also. Until the time of the jurisdictional hearing, the parents had separate, supervised visits with the children.

Mother was interviewed by social workers and told them that she was not afraid of Father, her husband of 12 years, and she did not want to obtain a restraining order against him. Mother said it was she who started the fight. She was upset at the maternal grandmother for calling 911 when she arrived at her parents' house. She did not think Father had a drug problem. Mother's father and her brother stated that Father was addicted to pain killers, and he had participated in Veterans' Administration rehabilitation programs.

Father told the investigating social worker that he and Mother were fighting about money when she started slapping and hitting him. Mother was in touch with Father and wanted to move back in with him, but Father was planning to relocate to be with his family in West Virginia. He said he did not have a drug or alcohol problem.

4

In preparation for the jurisdictional hearing, Agency social workers interviewed the children. J.M. said, " 'My daddy took my mom's neck and I cried . . . .' " She heard her mom's neck crack. She also said, "I don't know what's wrong with him. He always does that."

R.M. told the investigating social worker that the parents had been fighting, hitting or throwing things, nearly every day for several years, and she sometimes tried to stop them. She did not feel comfortable when her parents were together and noticed that her mom was continuing to talk on the phone with her dad in a sneaky way, by going outside and away from the family.

E.M. told the social worker that she thought Father should live by himself and not in the same house with the rest of the family.

At the jurisdictional hearing in October 2013, the juvenile court sustained the petitions, declared the children dependents, and continued their placement with the maternal grandparents. The parents were present with counsel and informed about reunification services and the requirements of the case plan, including therapy.

During the period before the six-month review hearing, Mother lived primarily with Father, although her plan called for her to live with her parents. Mother and Father argued and disagreed about things, such as a male friend of Mother's. She was having unsupervised visits with the children on Friday afternoons.

In February 2014, Father had a positive drug test for methamphetamine and he admitted to drug use. He was not involved in substance abuse treatment. At therapy sessions, Father said he was the victim of domestic violence. The therapists put off any

conjoint therapy plans until the individual therapists agreed the time was right. Father was having supervised visits with the children. R.M. did not always want to go to the visits, and she told the social worker Mother had left the grandparents' home to move in with Father. R.M. felt that Mother was choosing to be with Father over being with the children. The court appointed a court appointed special advocate (CASA) for the children in March 2014.

At the six-month review hearing in April 2014, the children were continued in placement with the maternal grandparents, where one of Mother's brothers also lived. The children were receiving individualized therapy. The court found it would be detrimental to return the children to parental custody, and reasonable services had been provided and would be continued for another six months.

Although Mother did not disclose to the Agency that she still maintained a relationship with Father, social workers learned that she was seeing him during her unsupervised visitations, and her visits were returned to supervised status. Mother started living in Father's apartment as of May 2014, and the apartment manager told social workers that both of their names were on the lease.

Father was participating off and on in his reunification services. In May 2014, he tested positive for morphine and admitted to smoking marijuana. In July 2014, Father had some broken ribs and was taking prescribed Vicodin.

In September 2014, before the scheduled 12-month permanency hearing set for November 2014, the children were suddenly removed from the maternal grandparents' home. Once Father realized that E.M. was displaying sexualized behavior toward him,

6

he confronted Mother about it and then he flagged down a police officer on September 6, 2014, to report that E.M. had told him about Mother's 18-year-old brother molesting her. The children were taken away in a police car. Both the grandmother and Mother, who was also living there, were aware that the brother had been repeatedly molesting the child (about 30 times), but they did not report it. R.M. later told the CASA volunteer that one or more of the adults in the home had instructed the children not to disclose the molestations.

After short stays in the Polinsky Center, R.M. was placed with a maternal great-aunt, and E.M. and J.M. were placed together in a different relative's home. They would be receiving counseling from a new therapist, after they became settled in their new placements. Supervised visitation with the parents continued.

From June to September 2014, R.M. had been participating in individual therapy and she was evaluated as seeming depressed and angry. Once she was placed with her great-aunt, she told the CASA that she was unhappy there and did not want to be away from her sisters.

## B. Termination of Reunification Services

In a report prepared for the 12-month review hearing, the social worker said the parents were having a slow start in reunification services. As of October and November 2014, the social worker recommended that the court set a section 366.26 hearing for selection and implementation of a permanent plan.

At the contested 12-month review hearing on November 6, 2014, the court found the parents had not made substantive progress with the case plan and that returning the

7

children to parental custody would be detrimental to them. The court determined there was no substantial probability the children would be returned to parental care by the 18-month date. Court-mandated reunification services were terminated and a hearing was scheduled for selecting and implementing permanent plans.

Mother filed a request to challenge the orders of the juvenile court at the 12-month review hearing. (Cal. Rules of Court, rule 8.452.) However, this Court dismissed the case after her attorney indicated there were no viable issues for review. (*In re R.M.* (D066983), dism. Dec. 26, 2014.)

### C. Modification Motion and Permanency Planning Hearing

By February 2015, it was learned that R.M. had been engaging in cutting behavior, apparently as a means of trying to take control of her life. She was receiving therapy and making progress in learning other coping behaviors, as were the other children. E.M. had nightmares and was diagnosed as having an adjustment disorder with anxiety. She was in therapy to work on recovery from the traumas of being molested and witnessing her parents' domestic violence. J.M. had adjustment disorder and nightmares, and was reportedly clingy and needy.

In early March 2015, the Agency requested that the court allow the children to visit the paternal grandparents, who were prospective adoptive parents. The children had already visited their home in West Virginia. The paternal grandparents were telephoning the children a few times a week. Child welfare officials from the State of Virginia had recently evaluated the paternal grandparents' home and found it to be suitable as a placement for the children. (Fam. Code, § 7900 et seq., the Interstate Compact on

8

Placement of Children.)  The paternal grandparents were open to either adoption or guardianship.

On March 3, 2015, the court set a hearing date for Mother's upcoming modification motion, in light of the contested permanency planning hearing date set for April 2, 2015.  The court approved the Agency's travel request for the children to go to West Virginia on March 4, 2015.

On March 18, 2015, Mother filed a motion under section 388 for modification of the prior order terminating her reunification services.  She requested placement of the children with her, or further reunification services.  The modification hearing was continued to March 25, when a prima facie showing was deemed to be made, and the matter was combined with the April 2, 2015 hearing on the permanency plan.

In the discussion portions of this opinion, we will outline the evidence presented at the hearing, including addendum reports, all of which was considered for both the modification request and the permanency planning petition under section 366.26.  In this introduction, we merely note that the juvenile court heard telephonic testimony from R.M., and testimony from Mother and the social worker who wrote the adoption assessment.  Mother had begun divorce proceedings and in January 2015 had obtained a restraining order against Father.

With respect to Mother's section 388 petition, the court evaluated the testimony and the reports, and observed that the domestic violence had been grave and serious, and had been going on for a long time.  The court evaluated Mother's testimony as showing she was still seeking out meetings with Father, despite the restraining order she had

9

obtained against him. The court noted that Mother had testified she felt Father was like a drug to her and she was addicted to him. R.M. and E.M. were ambivalent about returning to Mother's care, and the court concluded Mother had not shown the children would be safe with her. The court determined that the evidence did not support a finding of changed circumstances, nor that a placement with Mother would be a means of promoting the children's best interests.

The court then heard argument on the permanency planning issues. The Agency represented that it was seeking to keep the sibling group together, the children had been with the paternal grandparents for a month, and things were going well. The Agency evaluated the children as adoptable, although R.M. did not want to be adopted by strangers.

In making its ruling, the court acknowledged that the children had only been with the prospective adoptive parents for about a month, and it could be just a honeymoon period. Overall, however, it appeared to the court that the paternal grandparents were opening their home in a positive way and the children were responding well to that. The court found by clear and convincing evidence the children were likely to be adopted and none of the statutory exceptions, in particular, the beneficial parental relationship exception, applied. (§ 366.26, subd. (c)(1)(B)(i).) Parental rights were terminated and the children were referred to the Agency for adoptive placement. Each parent timely appealed.

II

*MODIFICATION MOTION*

A.  Applicable Standards:  Two Prongs

In deciding whether the petition makes the necessary modification showing of changed circumstances, of such a nature that a modified order will promote the best interests of the child, the juvenile court may consider the entire factual and procedural history of the case.  (§ 388, subd. (a); *In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) On the best interests factor, considerations include (1) the seriousness of the problem leading to the dependency; (2) the relative strength of the child's bonds with the parent and with the caretaker; and (3) the degree to which the problem could be easily resolved. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 532.)

Mother had the burden to show by a preponderance of the evidence that the proposed change would promote the best interests of the child.  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 316-317; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 806 (*Zachary G.*).)  This court reviews the grant or denial of a petition for modification under section 388 for abuse of discretion.  (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)  We inquire if the lower court exceeded the limits of legal discretion by making any arbitrary, capricious, or patently absurd determinations.  (*In re Stephanie M.*, *supra*, at p. 318; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642.)

11

## B. Evidence from Mother and the Agency

In April 2015, the modification petition was heard together with the permanency planning hearing, and the same reports and evidence were considered. (§§ 366.26, 388.) The court conducted an evidentiary hearing, having determined that Mother's petition had made a prima facie case of changed circumstances and some showing toward a best interests finding.

On appeal, Mother contends the juvenile court erred or abused its discretion in denying her petition for modification, which sought placement of the children with her and maintenance services, or alternatively, additional reunification services. (§ 388.) Father joins in her arguments.

In support of her modification petition, Mother pointed out that since her reunification services were terminated in November 2014, she had participated in numerous services at her own expense. She had filed for divorce and she attached a copy of a January 21, 2015 restraining order against contact with Father, with proof of her completion of a domestic violence relapse prevention program. As of February 24, 2015, Mother was in the process of taking Father off of her apartment's rental agreement.

Also attached to the modification petition was a letter from Mother's therapist, showing that Mother was paying for her continuing therapy. The therapist described the progress Mother had made in understanding and disclosing Father's abuse toward her, which included striking her with objects and threatening to kill her if she were to leave the relationship. Mother now understood that she grew up in a codependent family and she needed to cut off relationships that were harmful to her or her children, and she had

12

done so.  She derives strength from her religion and her athleticism (running) and takes care of her health.  Accordingly, she contended that modifying the placement order would be best for the children, because she had maintained a strong bond with them and had changed her life in several positive ways.

Mother testified in support of modification, explaining that she had employment as a substitute teacher, and had her own apartment where the children could live.  She viewed her attachment to Father as an addiction and understood that she had to cut him out of her life, and said she no longer favored him over her children.  Although she had obtained a restraining order, she had recently contacted him to discuss how visitation with the children would be affected; she now realized that she had made a bad decision in contacting him.  When asked how long the violent domestic abuse in their home had been going on, she said it had lasted at least eight years, and she did not see that it had to end until she hit rock bottom, when the children were taken away in a police car in September 2014.

The court heard testimony from R.M. by phone, about how she was adjusting to life in West Virginia with the paternal grandparents and at a new school where she was doing better.  She said it was a huge change but the people there were nice.  When Mother's attorney asked R.M. about her preferences about adoption by her paternal grandparents or guardianship, she replied that she didn't know how a child like her could choose their future with only a few words.

The Agency's social worker Jessica Carter, who prepared the March 3, 2015 assessment report, testified about the bases for her recommendation of adoption as the

best permanent plan. She was concerned that Father was still receiving mail at Mother's address, even though they said they were not living together. Also, Father and Mother had recently been seen together looking at wedding rings at a church gift shop, and Carter believed that the parents are still together on some level and they had a long way to go to break the cycle of abuse.

Carter had observed six of Mother's supervised visits with the children between December 2014 and February 2015, finding that Mother acted appropriately and the children enjoyed the visits. The same was true of Father's visits. When Carter asked the children their views on adoption, R.M. said she did not want to be adopted by strangers, and eight-year-old E.M. just shrugged her shoulders and said it didn't matter. Although the children would normally experience some grief and loss if they did not see Mother again, Carter did not believe that the level of communication they were then having with Mother would support any finding that they would suffer detriment, or be unable to function normally, without Mother in their lives. There was no indication that the paternal grandparents would not allow the parents to have contact with the children, if adoption went forward.

## C. Ruling and Analysis

In its ruling, the court acknowledged that the domestic violence problems leading to dependency were of a grave and serious nature. (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 532.) The court evaluated Mother as healing and changing, by understanding her emotions more completely. However, the court noted that she had recently sought Father out to see him, giving a reason that did not make sense (discussing

14

visitation when the children were already across the country), and she still viewed herself as addicted to their relationship. Whether she could overcome that addiction with her new insights remained to be seen, and the evidence did not yet show that she could keep the situation safe for the children.

The court turned to the best interests factor, evaluating the children as hugely affected by the history of domestic violence, lasting for a long time. Although a lot of things were seen to be playing out in the situation, such as the effects of Father's service injuries, the main purpose of the court was to make sure that the children were safe. The court concluded that the recent actions by Mother, such as removing Father from the apartment lease, were not of a nature that demonstrated the requested modification of the placement orders would be in the best interests of the children.

In its section 388 ruling, the court appropriately addressed both the extent of the changes of circumstances Mother had shown and their effects upon the best interests of the children. In light of the extensive history of the Agency's involvement with the family, involving two voluntary case plans before the current one, the court had reason to be concerned about the extent of the positive changes that Mother had been able to make. (§ 388, subd. (a); *In re Justice P.*, *supra*, 123 Cal.App.4th at p. 189.) She had concealed her knowledge that E.M. was being molested at the previous placement. Although she had good intentions and was healing and changing for the better, the court could reasonably conclude from the evidence that the changes were not so significant as to justify a change in the orders.

15

On the best interests factor, the court properly took into account the degree of attachment between the children and Mother, and it had a reasonable basis to conclude that the influence of the underlying parental relationship would likely continue to be adverse to the interests of the children.  The cycle of domestic violence was not a problem that the parents could easily resolve.  (*In re Kimberly F.*, *supra*, 56 Cal.App.4th at p. 532.)  The well-being of the children had been harmed by living in a serious domestic violence situation for over eight years, and it was within the bounds of the court's discretion to conclude that returning them to Mother's care would not promote their best interests.  Even though another judge could have made a different decision, in view of all the relevant factors, we cannot say that the modification ruling amounted to any abuse of discretion.  (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318.)

III

*SUFFICIENCY OF EVIDENCE ON ADOPTABILITY FINDING*

To challenge the judgment terminating parental rights, both Mother and Father claim that the evidence as a whole, and the Agency's adoption assessment report in particular, did not supply a clear and convincing showing that these children were likely to be adopted within a reasonable time.  We outline our standards of review and evaluate the record in that light.

A.  Applicable Standards and Issues Presented

Under section 366.21, subdivision (i)(l)(C), the adoption assessment report was required to include "an evaluation of the child's medical, developmental, scholastic, mental, and emotional status," for purposes of evaluating whether the children were

16

likely to be adopted. Clear and convincing evidence is required to support a finding that a child is adoptable within a reasonable time. (*In re Brian P.* (2002) 99 Cal.App.4th 616, 623-624; *In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.) More than an unsupported opinion from a social worker is required to support a finding of adoptability. (*In re Brian P.*, *supra*, at p. 624.)

If an adoption assessment report, viewed in light of the totality of the evidence before the court, omits to examine significant factors that are necessary to make an adoptability finding, the report may be deemed so deficient as to impair the basis of a judgment terminating parental rights. (*In re Valerie W.* (2008) 162 Cal.App.4th 1, 14.) However, substantial compliance with statutory requirements may be deemed adequate if the record as a whole provides the juvenile court with sufficient factual information to determine whether adoption is feasible and in the children's best interests. (*In re John F.* (1994) 27 Cal.App.4th 1365, 1378.) Even where the evidence shows a child may have future problems, a finding of adoptability may still be appropriate. (*In re Jennilee T.* (1992) 3 Cal.App.4th 212, 224-225.)

During the combined hearing on April 2, 2015, the court received into evidence, without objection, the Agency's adoption assessment report dated March 3, 2015. (§ 366.21, subd. (i)(l).) The Agency preliminarily claims that any argument that this report was inadequate cannot be raised on appeal, since it was not preserved by objection. (See *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411–412 [claim of inadequacy of adoption assessment report may be deemed forfeited, where no objection was raised at trial]; *In re G.C., Jr.* (2013) 216 Cal.App.4th 1391, 1398-1400.) However, both Mother

17

and Father's briefs on appeal address the state of the record as a whole, and do not merely rely on the nature of the report. It is appropriate for us to examine their substantive arguments.

## B. Analysis of Arguments

Each parent claims that since the children have demonstrated different kinds of emotional problems over the years, the record did not support adoptability findings as of the time of the hearing. Visitations with the parents consistently went well and the children retained their attachments to the parents. R.M. and E.M. had expressed ambivalence about the adoption decision, and R.M. had not adjusted well to a previous placement with her maternal great-aunt, away from her sisters.

At the time of the hearing, the placement with the paternal grandparents was only a month old and the parents argued that more time was needed to evaluate adoptability. The CASA volunteer's report suggested that a continuance of the permanency planning hearing might be appropriate to allow further evaluation of the relatively recent placement with the paternal grandparents. Both parents sought a guardianship order instead of an adoptability finding, to enable further parental contact that would likely benefit the children.

In the adoption assessment, the children were evaluated as both generally and specifically adoptable, individually and as a sibling set. (§ 366.21, subd. (i)(l).) The paternal grandparents' home had been evaluated as suitable for adoption, and they had undergone training about how best to care for at risk children and deal with their typical problems. The children were doing better in school than before, were more confident and

18

independent, and seemed to be more settled emotionally. Even if that month-old placement did not work out, the Agency was aware of five local families who had been approved during adoptive home studies, and who were interested in adopting three siblings like these.

The social worker analyzed whether the children were individually suitable for adoption, and determined that there were eight additional prospective adoptive homes for R.M., 19 for E.M., and 41 for J.M. In her testimony, the social worker referred to the evidence about the parents' continuing, recent association with one another on some level, and suggested that this indicated the "limbo" that the children were living in was likely to continue, unless adoption were ordered as the permanent plan.

In issuing its oral ruling, the court acknowledged that the placement with the paternal grandparents was quite recent, and arguably, it was in the honeymoon stage. The court was aware that the children will continue to face mental health and other challenges. (*In re Jennilee T.*, *supra*, 3 Cal.App.4th 212, 224-225.) However, based on the available evidence about the children's circumstances developmentally, and the emotional status of each, the court determined the children were adoptable within a reasonable time, both specifically and generally. The parents have not shown why the problems that the children were encountering were of such a nature that adoption was not reasonably probable. The juvenile court was provided with sufficient information to determine, under a clear and convincing standard, that adoption is feasible and in the children's best interests. (*In re John F., supra,* 27 Cal.App.4th 1365, 1378; § 366.21, subd. (i)(l).)

19

IV

*BENEFICIAL PARENTAL RELATIONSHIP EXCEPTION*

Both Mother and Father contend the beneficial parental relationship exception to adoption properly applies to this case. (§ 366.26, subd. (c)(1)(B)(i); *Autumn H., supra,* 27 Cal.App.4th at p. 575.) They argue that insufficient evidence supports the court's decision to terminate parental rights, in light of their efforts to maintain the positive bonds they had established with the children. Father argues that "the better decision would have been to continue supervision over the case," to ensure that the children could still have contact with the father that they love. Additionally, Mother argues that guardianship might have been a better option, to enable her to provide ongoing emotional support to her children.

A. Applicable Standards; First and Second Prongs

"Regular visitation and contact" are statutory threshold requirements for a claim that a beneficial parental relationship has been maintained. (§ 366.26, subd. (c)(1)(B)(i).) Both Mother and Father complied with the visitation schedule, although Father sometimes appeared agitated. He generally acted appropriately, and the children enjoyed the visits. The Agency's respondent's brief concedes that the parents made a sufficient showing on the first prong, regular visitation.

However, the court was next required to determine if Mother and Father had shown how the children would substantially benefit from continuing the relationships. (*Zachary G.*, *supra*, 77 Cal.App.4th at pp. 810-811.) To support this exception to adoption, the court must find "a compelling reason for determining that termination

20

would be detrimental to the child." (§ 366.26, subd. (c)(1)(B); *In re C.F.* (2011) 193 Cal.App.4th 549, 553.)

The juvenile court considers the detriment issue on a case-by-case basis, taking into account the many variables that can affect the parent-child relationship. (*Autumn H., supra*, 27 Cal.App.4th at pp. 575-576; *In re J.C.* (2014) 226 Cal.App.4th 503, 532.) Among the variables to be considered in evaluating the benefits of a parental relationship are the children's ages, the amount of time they spent in the parents' care, whether the interactions are positive or negative, and whether the children have particular needs that the parents can best satisfy. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467.) It is not enough for a parent to show frequent and loving contact during pleasant visits. (*In re C.F., supra,* 193 Cal.App.4th at p. 555.) More than incidental benefits from maintaining parental contact are required for this exception to apply. (*Id.* at pp. 558-559; *In re Helen W.* (2007) 150 Cal.App.4th 71, 81.)

The court in *In re J.C., supra*, 226 Cal.App.4th at pages 530 to 531 applied a substantial evidence standard of review to the preliminary factual issue of whether the parents have proved any benefits were conferred from their parental relationships with the children. However, as to the weighing test under section 366.26, subdivision (c)(1)(B)(i), in which the juvenile court balances the parent-child relationship against the benefits the child would derive from adoption, the appellate court opined that the abuse of discretion test may apply to evaluate this " ' " 'quintessentially' " discretionary decision.' " (*In re J.C., supra,* at p. 531*; In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) Based on the respective showings, the court balances "the strength and quality of

21

the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.)

The weight of authority applies the substantial evidence test to appeals from decisions about the beneficial parental relationship exception. (*Autumn H., supra*, 27 Cal.App.4th at pp. 575-577.) This reviewing court makes presumptions in favor of the judgment, views the evidence in the light most favorable to the prevailing party (the Agency), and gives the order the benefit of all reasonable inferences. (*In re C.F., supra,* 193 Cal.App.4th at p. 553; *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

B. Application of Criteria: Extent of Beneficial Parental Relationship

Mother points to her consistent visits and telephone calls with the children throughout the proceedings, in which she acted in a parental role and was accepted by the children as such. Because of the bond among them, particularly with R.M., Mother argues that the plan of adoption should be viewed as detrimental to the children. It would be less harmful to the children, Mother argues, if the juvenile court had selected guardianship, since the paternal grandparents were willing to consider it, although they preferred adoption.

Father likewise points out that he successfully maintained weekly visitations with the children, and they were substantially and positively attached to him. Father acted in a nurturing and affectionate manner toward the children, and they responded in kind. He was able to pay attention to each of the children and talk to them about their schools and activities.

22

Even accepting the evidence that these relationships were mainly parental in nature, the record also contains a strong showing that the benefits of those relationships were not of such a nature as to promote the children's well-being, in a manner outweighing the potential well-being to be gained in a permanent home with adoptive parents. (*In re Amber M* (2002) 103 Cal.App.4th 681, 689.) Viewed in the light most favorable to the judgment, the evidence does not support the contentions that the children had significantly positive emotional attachments to Mother and Father. (*In re C.F., supra,* 193 Cal.App.4th at p. 555.) The children had developed insights into the adverse effects that the parents' relationship to one another had on the children, and R.M., E.M. and J.M. had each expressed to social workers or the CASA volunteer some of these feelings, about how the family dynamics had created negative or unpleasant effects on them. (See *In re Angel B.*, *supra*, 97 Cal.App.4th 454, 467.)

Further, two previous voluntary cases opened by the Agency had failed to assist the parents, and they were still unable to make the needs of the children a priority over their own needs. Mother had not taken action when she learned E.M. had been molested. Mother admitted that she still had an ongoing and codependent relationship with Father, although she was learning to avoid it to some extent. The juvenile court had a substantial basis in the evidence to find that the beneficial relationship exception to adoption should not apply, because the volatile nature of the parents' relationship had caused harm to the children. The evidence supported a conclusion that continuing the parental relationships would only keep the children in limbo, which was contrary to their needs for stability and permanence.

The court was made aware that the paternal grandparents were open to either adoption or guardianship. However, in response to the evidence that the underlying problems between the parents still existed and still raised significant protective issues, the court made a factual finding that the children had been damaged throughout their "pretty tough childhood[s]." Consequently, the court concluded that their real and current needs were to have responsible adults in their lives making good choices for them, such as having a caring adoptive parent decide whether allowing continued parental contact and visitation would assist them in their growing up process.

Moreover, the juvenile court had an adequate basis in the record to conclude that the children did not have special needs that only Mother and/or Father could satisfy. (*In re Angel B., supra,* 97 Cal.App.4th at p. 467; *Autumn H., supra,* 27 Cal.App.4th at pp. 575-576.) These parents' presentations fell short of showing that the parental roles that they filled created substantial, overriding benefits to the children, such that it would be detrimental to terminate those parental relationships. (*In re C.F., supra,* 193 Cal.App.4th at p. 555.) Substantial evidence supports the juvenile court's findings and orders. (*In re L.Y.L.*, *supra*, 101 Cal.App.4th at p. 947.)

DISPOSITION

The judgments and orders are affirmed.


HUFFMAN, Acting P. J.

WE CONCUR:


NARES, J.


AARON, J.

25